PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3712
_____

UNITED STATES OF AMERICA

v.

DOMINIQUE JACKSON,
a/k/a DOMINIQUE GREEN

Dominique Jackson,

Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Crim. No. 2-10-cr-00199-004)
Honorable Donetta W. Ambrose, District Judge
_____

Argued December 7, 2016

BEFORE: FISHER*, KRAUSE, and GREENBERG, <u>Circuit
Judges</u>

_____
*Judge Fisher assumed senior status on February 1, 2017.

(Filed: February 24, 2017)
_____

David S. Hickton
United States Attorney
Donovan J. Cocas (argued)
Assistant U.S. Attorney
Rebecca R. Haywood
Assistant U.S. Attorney
Michael L. Ivory
Assistant U.S. Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219

    Attorneys for Appellee

F. Clinton Broden (argued)
Broden & Mickelsen
2600 State Street
Dallas, TX 75204

    Attorneys for Appellant

_____

OPINION OF THE COURT
_____

GREENBERG, Circuit Judge.

## I. INTRODUCTION

This matter comes on before this Court on Dominique Jackson's appeal from his conviction for conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846. Jackson's principal contention is that the District Court erroneously denied his pretrial motions to suppress evidence derived from what he claims were unlawfully intercepted cellphone calls. In addition he argues that the Court made prejudicial plain errors at his trial.

Before trial, Jackson moved to suppress evidence of co-conspirators' cellphone calls intercepted as authorized by district court orders. These interceptions, pursuant to Title III of the federal Omnibus Crime Control and Safe Streets Act of 1968, governing wiretaps, comprised a significant amount of the evidence at trial, though Jackson was a participant in only a small number of calls. A Pennsylvania state court had authorized wiretaps sought by state law enforcement officers and information obtained from those wiretaps was used in affidavits when federal wiretap orders were sought. Jackson challenges the district court authorized wiretaps because he contends that the state court lacked jurisdiction to permit the underlying wiretaps of cellphones outside of Pennsylvania. In this case intercepted calls were placed and received outside of that state, even though the calls in part concerned cocaine trafficking in Pennsylvania. Accordingly, Jackson contends that the evidence obtained through the federal interceptions was the

3

fruit of illegal conduct and should have been suppressed.[1]

Jackson also claims that during the trial there were three unchallenged prejudicial plain errors: (1) the admission of a case agent's testimony interpreting the contents of certain telephone calls; (2) the admission of co-conspirators' testimony about their convictions and guilty pleas for the same crime; and (3) the prosecutor's mention of a co-conspirator's Fifth Amendment right not to testify when she was prompted to identify the evidentiary rule that permitted the admission into evidence of what otherwise would have been inadmissible hearsay. Jackson urges that those errors separately and cumulatively require reversal of his conviction.

We conclude that inasmuch as the District Court did not err in denying Jackson's motions to suppress the wiretap evidence and his other contentions of error, even if correct, would not make claims rising to the level of plain errors entitling him to relief, we will affirm Jackson's conviction.


## II.  STATEMENT OF JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 18 U.S.C.

---

[1] There were transcripts of the phone calls supplied to the jury but the District Court told the jury that "[t]he recordings themselves are the evidence. If you notice any differences between what you hear in the recordings and what you read in the transcripts, you must rely on what you hear, not on what you read." Supp. App'x at 100.

§ 3231 and we have jurisdiction under 28 U.S.C. § 1291.

"We review the denial of a suppression motion for clear error as to the underlying facts, but exercise plenary review as to its legality in light of the district court's properly found facts." United States v. Coles, 437 F.3d 361, 365 (3d Cir. 2006). To the extent that Jackson failed to object to any of the issues during the trial that he raises for the first time on appeal, our review is for plain error. See Fed. R. Crim. P. 52(b); United States v. Christie, 624 F.3d 558, 567 (3d Cir. 2010). When exercising such a review, an appellate court may evaluate whether there has been "[a] plain error that affects substantial rights." Fed. R. Crim. P. 52(b). To be a "plain" error, the error must be "clear under current law." United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 1777 (1993). Moreover, the error must involve substantial rights and prejudice the defendant by "affect[ing] the outcome of the district court proceedings." Id., 113 S.Ct. at 1778. The plain error rule "leaves the decision to correct the forfeited error within the sound discretion of the court of appeals." Id. at 732, 113 S.Ct. at 1776. A court of appeals will decline to grant relief on a plain error basis unless the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. (internal quotation marks and citation omitted).

III.  BACKGROUND

A. Procedural History

A grand jury indicted Jackson and seven co-defendants on one count of "conspiracy to distribute and possess with intent

5

to distribute five kilograms or more of cocaine from in and around July 2010 and continuing thereafter to on or about October 7, 2010." Supp. App'x at 487. Jackson was the only one of the eight defendants who went to trial. Before his trial, he submitted multiple motions to suppress wiretap evidence of intercepted cellphone conversations, but the District Court denied of all these motions. The jury found Jackson guilty, and on July 24, 2014, the Court sentenced him to a 135-month custodial term to be followed by five years of supervised release.[2]

B. The Evidence at Trial

The evidence at trial mainly was comprised of: (1) numerous cellphone calls intercepted in part pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968; (2) testimony from case agents who engaged in surveillance and testimony from Jackson's co-conspirators Dietrick Bostick and Christopher Stanley; and (3) documents such as hotel, plane, and bus receipts that corroborated witness testimony.[3]

This case grew out of a joint federal and state investigation. One of the case agents, Detective Shane Countryman of the Allegheny County Sheriff's Office, who was assigned to the Greater Pittsburgh Safe Streets Task Force with

---

[2] The custodial sentence later was reduced to 120 months, a sentence that Jackson does not challenge on this appeal.

[3] Our summary of the evidence focuses on Jackson and the relevant co-conspirators, and does not address evidence concerning other co-conspirators.

the Federal Bureau of Investigation, testified at length about the results of his investigation. See Supp. App'x at 67. He detailed an initial investigation into a street-level drug dealer and explained how that investigation led to wiretaps of cocaine suppliers Damell Gaines and Dietrick Bostick.[4] Id. at 79-81. After the FBI determined that a co-conspirator, Arthur Gilbert, supplied Bostick with cocaine, it obtained an order to wiretap Gilbert's phone as well. Id. at 80-81.

Co-conspirator Bostick testified at the trial describing his work as a middleman in the cocaine distribution network during the time period in which Jackson was engaging in cocaine distribution and for which Jackson was indicted and convicted. Bostick also interpreted a number of the calls to which he was a party. See id. at 291. He informed the jury that he used his Monroeville, Pennsylvania, house to hold cocaine for out-of-state distributors. See id. at 240, 282. He testified that about twice a month he received between five and 20 kilograms of cocaine from Gilbert, who was Jackson's cousin. Id. at 252-55, 337. Gilbert told Bostick that he paid between $24,600 and $25,700 per kilogram of cocaine. Id. at 259. Bostick, in turn, paid Gilbert around $30,000 per kilogram and sold each kilogram for around $34,500 to a number of distributors, including Gaines. Id. at 259-60, 264.

Both Gilbert and co-conspirator Christopher Stanley informed Bostick that the cocaine had been obtained from an individual named "Dom" in Texas. Id. at 255. Bostick testified that he understood that his payments went to "Dom," that "Dom" was Jackson, and that he had met Dom once in a strip

---

[4] The spelling of the name Damell Gaines is inconsistent throughout the record.

7

club in Atlanta.  Id. at 254, 263-65, 272.  An intercepted call supporting Bostick's testimony showed Gilbert telling Bostick that "I just heard from, uh, Dom, he is just, uh, said everything was alright."  Id. at 644.  Bostick stated that Jackson in July 2010 travelled to the Pittsburgh area, staying in the Doubletree Hotel in Monroeville.  Id. at 261-62.  Bostick testified that he took Gilbert to the same hotel.  Id.  Bostick admitted that he did not deal directly with Jackson even though he participated in the distribution chain involving Jackson.  Id. at 283.

Bostick testified that from July to October 2010 co-conspirators Arthur Brown, Melinda Adams, Philip Gilbert, and Shari Williams once or twice a month delivered between one to three kilograms of cocaine to him in Pennsylvania that they had obtained in Texas.  Id. at 256, 261-62.  Bostick stated that these persons smuggled the cocaine in their pants when travelling by plane or Greyhound bus.  Id. at 257.  When Bostick received the cocaine he paid the persons who delivered it.  Id. at 262-63.  On the day he was arrested, Bostick was expecting to receive a shipment from Brown and Williams.  Id. at 261.

Co-conspirator Christopher Stanley testified about his experience trafficking cocaine with Jackson.  He detailed a number of instances during which he acted at Jackson's direction as the intermediary between Jackson and Bostick.  One such instance was on June 27, 2010, when Jackson directed Stanley to fly to Pittsburgh after two associates already had delivered cocaine to Bostick for Jackson.  Id. at 325.  Jackson told Stanley to call Bostick to obtain approximately $34,800 as payment for the cocaine.  Id. at 325-29.  Stanley subsequently travelled to Bostick's house in Monroeville and collected the cash.  Id. at 327.  Stanley and other persons with him stayed at the Doubletree Hotel in Monroeville that night.  Id.  On June 28,

8

2010, Stanley and the others hid the cash on their bodies and, at Jackson's direction, transported the cash to Dallas.  Id. at 326, 330-31.

Jackson then directed Stanley on July 1, 2010, to fly back to Pittsburgh to transfer cocaine to Bostick.  Id. at 332-33. Jackson gave one kilogram of cocaine to Stanley and his associate and directed Stanley to book a room for Jackson in Pittsburgh.  Id.  Upon arriving in Pittsburgh, Stanley and his associate went to the Doubletree Hotel in Monroeville, where they delivered the kilogram of cocaine to Bostick.  Id. at 334. Stanley testified that Jackson took a flight to Pittsburgh the day after the delivery and met him at the Doubletree Hotel.  Id. at 335-36.  Jackson obtained payment for the cocaine the following day and flew with Stanley back to Dallas on July 4, 2010.  Id. at 338.  The transfers at that time included three kilograms of cocaine and $64,000 in cash.  Id. at 338-39.  Detailed cellphone records showing that Jackson's cellphone on June 30, 2010, accessed a cell tower in Monroeville corroborated this testimony as did Bostick's testimony that Jackson in July 2010 stayed at the Doubletree Hotel in Monroeville to obtain payment, and Stanley's receipt for the Doubletree Hotel in Monroeville for the dates June 29, 2010, through July 4, 2010.  Id. at 261-62, 300-01, 387.

Stanley also testified about other trips to Pittsburgh in which he acted as an intermediary between Bostick and Jackson.  On one occasion, Jackson directed Stanley to travel to Pittsburgh to assist in delivering two kilograms of cocaine to Bostick and to transport the payment for the cocaine to Jackson in Dallas.  Id. at 341-43.  Stanley testified that Jackson supplied the cocaine for the transaction.  Id.  Stanley obtained $35,000 for each kilogram of cocaine, and he and his associates turned

9

the money over to Jackson in Dallas.  Id. at 343-346.  Stanley stated that overall he came to Pittsburgh four times.  Id. at 346.

Stanley detailed two times when he stayed in Dallas while working for Jackson.  Both times Jackson in Dallas gave him cocaine that Stanley, in turn, delivered to co-conspirator Brown.  On August 11 or 12, 2010, Brown came to Dallas from Pittsburgh.  Id. at 347-48.  Intercepted phone calls showed that Brown told Gilbert that he was going to a Denny's restaurant on the afternoon of August 12, 2010.  Id. at 666.  Stanley arranged with Brown to meet him there.  Id. at 668.  Detective Countryman observed Stanley pick up Brown and Brown's luggage at the restaurant.  Id. at 174-76.  In an intercepted call later that night, Gilbert asked Bostick for "Dom's" number.  Id. at 670.  After Brown made a number of intercepted calls to Gilbert and Stanley, Stanley in an intercepted call gave Jackson's phone number to Brown.  Id. at 671-79.  Even though there was no subsequent call to Jackson that night at least that was admitted into evidence, Stanley testified that Jackson told Brown to ask Stanley to check to see "how he got it tucked," meaning "how he had the cocaine placed on his body."  Id. at 348.  The intercepted phone call in which Brown asked Stanley to do so was evidence in the trial.  Id. at 685.  Stanley dropped Brown off at the Greyhound bus station in Dallas, and Brown transported the cocaine back to Pittsburgh.  Id. at 347-48.

In mid-September 2010, Jackson again gave Stanley two kilograms of cocaine to deliver to Brown, who was staying at a hotel in Dallas.  Id. at 350-51.  At the Greyhound bus station on September 17, 2010, Officer Ryan Miller watched Brown arrive on a bus and observed Stanley with him.  Id. at 156.  There was a text message on Jackson's phone sent to Gilbert on September 17, 2010, at 5:17 p.m., which read: "Western Union 800 to

10

Christopher Stanley, Dallas, Texas. Need for the rest of the deal. I'm going to be on the plane." Id. at 133. In an intercepted phone call at 5:33 p.m., Gilbert told Jackson that "when they ask for [the] sender where its [sic] from just say Pittsburgh" and Jackson responded that "my partner gonna call you so because, he gonna get everything together. . . . So when I land it'll be straight." Id. at 613. After Stanley delivered the two kilograms of cocaine, Stanley called Gilbert, who gave him the details about the Western Union payment. Id. at 351-53, 618. In an intercepted call, Stanley told Gilbert to send the Western Union number via text message. Id. at 618. A corresponding text message with a number and a Western Union receipt with that same number as its confirmation number listing Bostick as the sender and Stanley as the payee were admitted into evidence at trial. Id. at 133, 138-39.

Later that evening, Jackson in a call to Gilbert stated that "I'm tryin [sic] to um coordinate it." Id. at 629. In that call, Gilbert told Jackson that he gave $800 to "Chris" but was $400 short. Id. at 630-31. In an intercepted call made at 1:48 a.m. on September 18, 2010, Stanley told Gilbert, "[E]verything one hundred." Id. at 633. Stanley testified that the statement was code that the deal had been completed. Id. at 352. The next morning, September 18, 2010, Officer Miller observed Brown leave the Greyhound bus station from Dallas. Id. at 156-57.

Stanley testified about Jackson's unsuccessful attempt to deliver cocaine to Brown. Brown came to Texas in October 2010 to obtain three kilograms of cocaine from Jackson. Id. at 355. Brown paid Jackson around $90,000 in cash for the three kilograms of cocaine before Jackson had the cocaine. Id. at 356. Stanley watched Jackson use a money counter to count the cash in an apartment in Dallas. Id. But Jackson was unable to supply

11

the cocaine, so Brown obtained the cocaine from another supplier. Id. at 355-57. Jackson then needed to return the payment that Brown had made to him for the undelivered cocaine. Id. at 357. Stanley testified that Jackson returned the payment at a hotel with Crowne in the name in downtown Dallas. Id.

Countryman provided testimony about his surveillance that aligned with Stanley's description of the failed cocaine deal. He testified that on October 4, 2010, he observed Brown and another co-conspirator, Shari Williams, travel from the Dallas Greyhound bus station to the Crowne Plaza Hotel in that city. Id. at 104. In a phone conversation between Gilbert and Brown on October 4, 2010,[5] Brown told Gilbert to meet him at the "Crowne Plaza." Id. at 603. There were two receipts for two different rooms in the Crowne Plaza Hotel for October 4 through October 5, 2010, in Shari Williams's name. Id. at 106-07.

Countryman observed Jackson in the lobby of the Crowne Plaza Hotel at around 4:00 p.m. on October 4, 2010. Id. at 108, 110. He testified that Jackson was wearing a backpack. Id. at 111. About ten minutes later, Jackson left the hotel with a "much fuller" backpack. Id. at 112. A pen register trap and trace of one of Jackson's cellphone numbers indicated that Jackson was in the vicinity of the Crowne Plaza at that time. Id. at 113-15. On October 5, 2010, Countryman once again observed Jackson entering the Crowne Plaza Hotel with the same backpack. Id. at 115-16. Jackson entered the same room

---

[5] The date on the exhibit is October 4, 2010, but Countryman read it as October 1, 2010, at trial and was not corrected. Supp. App'x at 104, 603.

that Countryman had watched Gilbert leave "[m]ultiple times." Id. at 116. Countryman testified that based on Stanley's interview with him, he determined that Jackson's actions at the Crowne Plaza Hotel involved Jackson receiving and then returning the money for the failed cocaine purchase about which Stanley testified. Id. at 118.

An Allegheny County Sheriff's Department officer testified that on October 7, 2010, he participated with the FBI in the arrest of Brown and Williams at the Greyhound bus station in Pittsburgh. Id. at 63. He and other officers had been waiting for them to arrive on the bus from Texas. Id. at 63-64. When they arrested Brown, a kilogram of cocaine fell out of his waistband. Id. at 64. Further, they found a kilogram of cocaine in Brown's suitcase. Id. at 98. Williams also had a kilogram of cocaine in her luggage. Id. at 99. In a phone call placed on October 2, 2010, from Gilbert to Brown, Brown told Gilbert "[t]wo on and two in." Id. at 600. Countryman interpreted that code to mean that Brown had kilograms of cocaine on his person and in his suitcase, and contended that these facts corroborated what they found on Brown at the time of the arrest. Id. at 102.

According to Stanley, Jackson used an apartment in Dallas to store cocaine which he directed a friend, Allen Russell, to rent in Russell's name. Id. at 357-58. Stanley testified that Stanley and others "stayed there 95 percent of the time." Id. at 358.

The FBI searched an apartment in Stanley's name on October 7, 2010, and seized a credit card in Jackson's name, court and other documents in Jackson's birth name, a utility bill in Jackson's birth name, a magazine with ammunition, a food sealer with sealing bags, cling wrap, rubber gloves, cellphone

13

receipts in Stanley's name, various credit and identification cards in Stanley's name, an auto insurance policy jointly in Stanley's and Jackson's names, and a money counter, along with other documentation relating to other names including Allen Russell. Id. at 34-59. FBI agent Detective Jason Preece stated that cling wrap, gloves, food sealers and sealing bags are used to package either money or illegal drugs and the money counter is associated with drug trafficking because of the large sums of cash involved in drug transactions. Id. at 44, 53. Preece also testified that he saw Jackson and Stanley entering and leaving the apartment when conducting surveillance of the property. Id. at 56. The prosecutor introduced a text message from October 8, 2010, sent from a phone seized from Jackson stating, "I wish you would listen to me when I told you that shit was hot fbi [sic] went by da crib with search warrant meet me somewhere." Appellant's br. at 16 n.6; see Supp. App'x at 228, 230-31.

The FBI also searched Bostick's house on October 7, 2010. In the search they recovered a money counter, $4,700 in cash, numerous cellphones, marijuana, cocaine, a shotgun, an ammunition magazine, and a razor blade near a food scale. An FBI agent testified that these items were indicative of drug trafficking. Supp. App'x at 196-203. Before he was arrested Bostick attempted to flush cocaine down the toilet. Id. at 201.

Jackson testified and claimed that a voice in cellphone recordings in evidence attributed to him was not actually his voice. Id. at 463. He contended that evidence admitted at the trial was fabricated. Id. at 460. The jury convicted Jackson of one count of conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine. In the face of the overwhelming evidence against him Jackson does not contend that the evidence at trial, if admissible, did not support his

14

conviction.

## IV.  DISCUSSION

### A.  The Federal Wiretap Orders

Jackson contends evidence derived from the execution of two federal orders authorizing wiretaps of cellphones pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 should have been suppressed because the court that entered the orders based its finding of probable cause for their authorization on affidavits including information received from what he contends were illegal state wiretaps.  He claims that the state court lacked authority to authorize those wiretaps because it did not have jurisdiction over the cellphones being tapped when they were outside of Pennsylvania.  He maintains that a "state's jurisdiction is limited to the confines of its own borders."  Appellant's br. at 27.  Thus, he argues in his brief that the Pennsylvania wiretap statute authorizing "the interception of wire, electronic or oral communications anywhere within the Commonwealth" permits courts to authorize interception of communications only if all the phones are located within the borders of Pennsylvania at the time of the communication.  18 Pa. Cons. Stat. § 5710; Appellant's br. at 24-27.  When pressed at oral argument, he conceded that the Pennsylvania statute itself permitted a "listening post" theory but emphasized a constitutional argument that the principles of federalism and the historical relationship between the federal and state governments preclude a state from authorizing a wiretap if one party is

15

outside the state's borders.[6]  Oral Argument at 3:21-53. Inasmuch as several conversations concerning and involving Jackson occurred while the cellphones being used were located outside of Pennsylvania, Jackson claims that the interceptions of the conversations were illegal and evidence derived from the interceptions must be suppressed, even though Pennsylvania was one of the loci of the conspiracy.  See Appellant's br. at 24 (citing United States v. Giordano, 416 U.S. 505, 533, 94 S.Ct. 1820, 1835 (1974)).

The government responds that Jackson lacks standing in part to complain of the use of the interceptions because, except for six cellphone calls to which he was a party and therefore the use of which he has standing to challenge, he was not a party to the intercepted calls.  Appellee's br. at 13.  It contends that Title III, rather than state law, applies to the determination of the evidence's admissibility, and that Title III permits the interception of out-of-state calls if the interception, or "listening post," itself is located within the jurisdiction of the court authorizing the interception.  Appellee's br. at 14-15.  It also asserts that the Pennsylvania statute is "'generally modeled' after Title III" and follows its listening post requirement.  Id. at 16 (quoting Commonwealth v. Spangler, 809 A.2d 234, 237 (Pa. 2002)).  It further argues that any error with respect to the state interception was harmless, or, if harmful, the "good faith" exception to the exclusionary rule should apply so evidence derived from the state interceptions was admissible.  Id. at 18-20.

First, we address the government's standing argument

---

[6] Jackson's change of emphasis modified his position in his brief.

with respect to cellphone calls to which Jackson was not a party. "Standing" in the context in which the government uses the term on this appeal is shorthand for whether Jackson is an "aggrieved party" under Title III, not a jurisdictional requirement as it may be in other contexts. See 18 U.S.C. §§ 2518, 2510; United States v. Faulkner, 439 F.3d 1221, 1223 (10th Cir. 2006); United States v. Thompson, 944 F.2d 1331, 1339 (7th Cir. 1991).[7] If standing is not a jurisdictional requirement the government cannot challenge a party's standing on an appeal if it did not object to the party's standing before the district court. Alderman v. United States, 394 U.S. 165, 175 n.9 (1969) ("Congress has provided only that an 'aggrieved person' may move to suppress the contents of a wire or oral communication intercepted in violation of the Act. The Act's legislative history indicates that 'aggrieved person' . . . should be construed in accordance with existent standing rules.") (citation omitted). In point of fact, the government did not claim in the District Court that Jackson lacked standing to be treated as an "aggrieved person" per the terms of Title III and thus was without authority to move to suppress the interceptions. Accordingly, it cannot raise that argument on appeal. See 18 U.S.C. § 2518.

Inasmuch as Jackson has standing to challenge use of all

---

[7] To the extent that Jackson makes a Fourth Amendment argument, see Oral Arg. at 4:08-10, we note that "standing" in the Fourth Amendment context is "shorthand" for a "legitimate expectation of privacy" and is not a jurisdictional requirement to pursue an argument. United States v. Stearn, 597 F.3d 540, 551, 551 n.11 (3d Cir. 2010) (internal quotation marks and citations omitted). Thus, arguments based on a lack of Fourth Amendment "standing" are also waivable. Id.

17

the interceptions, we consider the statutory requirements for suppression on the merits. Title III governs suppression of evidence of interceptions offered in a district court trial. See United States v. Williams, 124 F.3d 411, 426 (3d Cir. 1997). It reads in relevant part:

> Any aggrieved person in any trial . . . before any court . . . of the United States . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—
>
> > (i) the communication was unlawfully intercepted;
> >
> > (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
> >
> > (iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a). The foregoing bases are the "exclusive grounds for suppression under Title III." Williams, 124 F.3d at 427. The Supreme Court has held that subsection (i) includes constitutional violations, such as those that Jackson alleges took place in this case, and outlaws "official interceptions without probable cause." Giordano, 416 U.S. at 526, 94 S.Ct. at 1832. The Court also has held that "communications intercepted pursuant to [an] extension order [based on an illegal initial wiretap] were evidence derived" from

the invalidly intercepted communications and thus required suppression.  Id. at 531-32, 94 S.Ct. at 1834.

We must determine whether the Title III wiretap orders were derived from unlawfully intercepted communications. Inasmuch as Jackson contends that Title III does not "authorize a state court to allow its law enforcement officials to eavesdrop on citizens of other states simply by locating the 'listening post' in the state where the state court is located[,]" we must consider whether Title III permits Pennsylvania courts to authorize within-jurisdiction interceptions of conversations that took place wholly outside of Pennsylvania.  Appellant's br. at 28.  Title III in relevant part permits a "State court judge of competent jurisdiction," 18 U.S.C. § 2516(2), to authorize "the interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting," Id. § 2518(3).  "[I]ntercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  Id. § 2510(4).

We join the other courts of appeals that have addressed this issue in adopting the "listening post" theory that under Title III either the interception of or the communications themselves must have been within the judge's territorial jurisdiction.  See United States v. Cano-Flores, 796 F.3d 83, 87 (D.C. Cir. 2015), cert. denied, 136 S.Ct. 1688 (2016) (adopting the "listening post" theory and reasoning that requiring a new "wiretap order in every district where [the government] thought a target could make calls . . . seems unworkable"); United States v. Henley, 766 F.3d 893, 911-12 (8th Cir. 2014), cert. denied, 135 S.Ct. 2065 (2015); United States v. Luong, 471 F.3d 1107, 1109 (9th Cir. 2006) ("The most reasonable interpretation of the statutory

19

definition of interception is that an interception occurs where the tapped phone is located and where law enforcement officers first overhear the call."); United States v. Jackson, 207 F.3d 910, 914 (7th Cir. 2000), vacated on other grounds, 531 U.S. 953, 121 S.Ct. 376 (2000); United States v. Denman, 100 F.3d 399, 403 (5th Cir. 1996); United States v. Tavarez, 40 F.3d 1136, 1138 (10th Cir. 1994) (holding that the Oklahoma wiretap statute, like the federal statute, authorizes wiretaps within the territorial jurisdiction where the contents were first heard); United States v. Rodriguez, 968 F.2d 130, 136 (2d Cir. 1992) (holding that "[i]t seems clear that when the contents of a . . . communication are captured or redirected in any way, an interception occurs at that time" but also "since the definition of interception includes the 'aural' acquisition of the contents of the communication, the interception must also be considered to occur where the redirected contents are first heard").

We need not determine whether a conversation recovered from a federally authorized wiretap has been "unlawfully intercepted" when the authority for the interception was based on information obtained from an unlawful state wiretap because the state wiretaps that were the sources of information in this case were lawful.[8]  The Pennsylvania statute is "generally

---

[8] Jackson claims that in situations in which state laws authorizing wiretaps are more restrictive than those in Title III, if a state court has authorized a wiretap, a federal court must determine whether the wiretap violated state as well as federal law.  Appellant's br. at 24 n.10.  The government disagrees.  Appellee's br. at 15.  Here, because we hold that federal and Pennsylvania law both utilize the "listening post" theory of determining territorial jurisdiction, we have no need to address this issue.

modeled" after the federal statute. Spangler, 809 A.2d at 237. Pennsylvania's wiretap statute, in a provision similar to a provision in Title III permits a state court to authorize the interception of calls outside of Pennsylvania if the "interception" is "anywhere within the Commonwealth." 18 Pa. Cons. Stat. § 5710. Indeed, it was after cases like Rodriguez expressly interpreted Title III as defining the location of the intercept to include the listening post that Pennsylvania's statute was amended specifically to clarify that the definition of "intercept" "include[s] the point at which the contents of the communication are monitored by investigative or law enforcement officers." Id. § 5702. See H. 187-47, 1997 Sess., at 1567 (Pa. 1997). These provisions make clear that for the interception to be lawful only the interception had to have been in Pennsylvania. There is no dispute that the interceptions at issue in this case were made in Pennsylvania. Hence evidence from the state wiretaps upon which the federal orders were partially premised is lawful.[9] Accordingly, we uphold the

---

[9] Jackson also argues that the listening post theory violates the Fourth Amendment by permitting the interception of calls occurring in other states or even other countries, untethered from any Pennsylvania connection. In support of his argument, Jackson offers only United States v. Cosme, No. 10-3044, 2011 WL 3740337 (S.D. Cal. Aug. 24, 2011), aff'd sub nom. United States v. Luis, 537 F. App'x 752 (9th Cir. 2013), and Cano-Flores, 796 F.3d 83. In each of those cases, however, the court recognized that Title III permits the wiretap of phones located in Mexico so long as the calls are intercepted within the United States. See Cosme, 2011 WL 3740337, at *10; Cano-Flores, 796 F.3d at 86. Pennsylvania's authorization of interceptions of

21

District Court's denial of Jackson's motions to suppress the evidence derived from the federal wiretaps that, in part, used state-wiretap-based affidavits to establish probable cause.

B.  The Alleged Trial Errors

---

calls placed in Texas is at least as jurisdictionally proper as the United States' interception of calls made in Mexico, a foreign sovereign.

While Jackson conceded in oral argument that the Pennsylvania statute codifies a "listening post" theory, he maintained that it went beyond the permissible scope of a state's jurisdiction.  Oral Arg. at 3:21-53.  Jackson claims that "it is a long standing principle, dating back to the common law, that a state's jurisdiction is limited to the confines of its own borders." Appellant's br. at 27.  But that claim overstates the limitations on state courts' jurisdiction.  After all, the Supreme Court long has held that "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if [the defendant] had been present [in the state] at the effect."  United States v. Lee, 359 F.3d 194, 206 (3d Cir. 2004) (quoting Strassheim v. Daily, 221 U.S. 280, 285, 31 S.Ct. 558, 560 (1911)).  Moreover, Pennsylvania law permits a person to be convicted only for "an offense committed by his own conduct or the conduct of another for which he is legally accountable" that has a conduct or result element that has a nexus in Pennsylvania.  18 Pa. Cons. Stat. § 102.  Therefore, while there may not be per se territorial restrictions in Pennsylvania regarding intercepting out-of-state calls, there are, in effect, territorial limitations on the state's use of such calls.

22

1.  The Admission of the Case Agent's Testimony

Jackson asserts that the District Court plainly erred in not sua sponte precluding the government's case agent, Countryman, from interpreting the meaning of certain intercepted telephone calls. Appellant's br. at 29. Though he does not dispute the propriety of Countryman's testimony about "arguable code terms" like "one in and one out," he claims that Countryman's testimony exceeded the limited scope of proper use. Id. at 32. He lists a number of questions that the prosecutor asked Countryman that he claims were impermissible. Id. at 32-33. Jackson also details a number of times when Countryman "interpret[ed]" a call to include situational and contextual information that is lacking in the call. Id. at 33-36. The government contends that the phone conversations were unclear and needed interpretation. Appellee's br. at 23. It also maintains that Countryman's testimony properly involved only his personal observations. Id. It further asserts that any error in the testimony regarding interpretations was not plain and that if there was such an error it did not prejudice Jackson. Id. at 25-30.

Inasmuch as Countryman's testimony was not admitted as expert testimony, Federal Rule of Evidence 701 governed the admission of his interpretation testimony as it deals with lay witness opinion testimony. Under Rule 701, lay witnesses may testify as to their opinions so long as the testimony is "rationally based on the witness's perception," is "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." "In layman's terms, Rule 701 means that a witness is only permitted to give her opinion or interpretation of an event when she has

23

some personal knowledge of that incident." United States v. Fulton, 837 F.3d 281, 291 (3d Cir. 2016).[10] The goal of Rule 701 is to give the trier of fact an "accurate reproduction of the event." Id. (internal quotation marks omitted). The evidence is permitted because it "has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." Id. (internal quotation marks omitted).

Rule 701(b)'s helpfulness requirement with respect to Countryman's testimony is at issue in this case. Under this requirement, lay witnesses may provide opinions about their understandings of recorded conversations when "[t]o the uninitiated listener, [the speaker] speaks as if he were using code" and the witness's "opinions are based upon his direct perception of the event, are not speculative, and are helpful to the determination" of a fact in the case if the "trial court vigorously police[s] the government's examination of [the witness] to ensure that he [is] not asked to interpret relatively clear statements." United States v. De Peri, 778 F.2d 963, 977-78 (3d Cir. 1985). But "the interpretation of clear conversations is not helpful to the jury, and thus is not admissible" under Rule 701. United States v. Dicker, 853 F.2d 1103, 1108 (3d Cir. 1988).

Rule 701(b)'s helpfulness requirement mandates the exclusion of "testimony where the witness is no better suited than the jury to make the judgment at issue."[11] Fulton, 837 F.3d

---

[10] We decided United States v. Fulton on September 19, 2016, three months after Jackson filed his brief in this Court.

[11] Jackson does not make this argument directly, but relies

at 293 (quoting United States v. Meises, 645 F.3d 5, 16 (1st Cir. 2011) (internal quotation marks omitted)). A case agent's testimony may not "simply dress[] up argument as evidence." Id. (quoting Meises, 645 F.3d at 17). Testimony may be so characterized when a witness "infer[s] [the defendant's] roles not from any direct knowledge, but from the same circumstantial evidence that was before the jury—effectively usurping the jury's role as fact-finder." Id. (quoting Meises, 645 F.3d at 16). "[W]here a case agent's testimony leaves the jury 'to trust that [the case agent] had some information—information unknown to them—that made him better situated to interpret the words used in the calls than they were,' when, in fact, he does not, such testimony is inadmissible under Rule 701(b)." Id. (quoting United States v. Freeman, 730 F.3d 590, 597 (6th Cir. 2013)) (citing United States v. Hampton, 718 F.3d 978, 982-83 (D.C. Cir. 2013); Meises, 645 F.3d at 16-17; United States v. Johnson, 617 F.3d 286, 292-93 (4th Cir. 2010); United States v. Freeman, 498 F.3d 893, 905 (9th Cir. 2007); United States v. Garcia, 413 F.3d 201, 213-14 (2d Cir. 2005); United States v. Grinage, 390 F.3d 746, 750-51 (2d Cir. 2004)). After all, the role of the "prosecutor [is] to argue in summation" what inferences to draw from the evidence. Id. (quoting Meises, 645 F.3d at 17).

We are satisfied that the District Court erroneously permitted Countryman on several occasions to express his understanding of the meaning of clear conversations. One of the most egregious examples is when Countryman interpreted Jackson's statement "you can go ahead and send him" to mean "it is okay now to send [a co-conspirator] to purchase cocaine in

heavily on similar propositions from a court of appeals in United States v. Hampton, 718 F.3d 978 (D.C. Cir. 2013). See Appellant's br. at 30.

25

Dallas." Supp. App'x at 129, 605. Further, Countryman provided unhelpful argument in the guise of evidence. In interpreting one unclear call, he testified: "So, [Jackson] lays out the conspiracy for you in this telephone call that Gilbert is sending Brown with the money. Brown gives the money to either the defendant or Stanley at the direction of the defendant and the defendant takes the money and goes and purchases the cocaine, gives the money back to Brown, Brown takes the cocaine back to Monroeville where it is sold and distributed." Id. at 144. While the call's meaning is unclear, there is seemingly no mention of code words for cocaine, money, or Monroeville in the call that Countryman interpreted, and nothing seems to indicate that any part of that conversation can be interpreted as broadly as Countryman did. Id. at 628-31. Countryman seems to infer the knowledge for his testimony on other evidence, rather than on his direct knowledge of the events.[12] In these circumstances his testimony was improper.

---

[12] Countryman improperly testified with respect to the interpretation of phone calls at other times. For example, he testified in detail about Gilbert's state of mind. He interpreted a call to mean that Gilbert "is not aware of Christopher Stanley's involvement in this set-up. . . . He is uncomfortable with Christopher Stanley being involved in these transactions because he doesn't know him." Supp. App'x at 140, 620. But the content of that call does not support that interpretation, and the parties to the call apparently did not use coded language. Id. at 620-21. The prosecutor asked Countryman, "We'll learn that in a subsequent call, we'll learn more detail about that?," to which he responded, "Correct." Id. at 140. Overall it is evident that Countryman was in no better position than the jury to interpret these calls.

Although the District Court erred in not sua sponte precluding the objectionable evidence that we have identified, we cannot conclude that the Court's error can be characterized as plain. Inasmuch as we decided Fulton, a case that would have been useful to the Court, after the trial in this case had concluded, the Court did not have the benefit of that opinion at the trial. Thus, we decline to hold that the error in admitting evidence regarding the interpretation of the calls was plain or obvious. Furthermore, even if we held otherwise, Jackson would bear the burden of showing that the error was prejudicial by impacting on the outcome of the trial, thereby affecting his substantial rights. Olano, 507 U.S. at 734-35, 113 S.Ct. at 1777. The testimony of Jackson's co-conspirators Dietrick Bostick and Christopher Stanley provided much of the same information as Countryman set forth in his interpretations of the phone calls, and the jury on its own could review the calls that Countryman wrongfully interpreted to reach its own conclusion as to their meaning in light of Bostick's and Stanley's testimony and the other evidence.[13]

2. The Admission of the Co-Conspirators' Testimony about

---

[13] In his brief Jackson contends that the testifying co-conspirators though "to a lesser extent" than Countryman, Appellant's br. at 36, gave improper evidence interpreting telephone calls. He does not, however, make reference to this testimony in his statement of issues in his brief, see id. at 9-10, and therefore he has waived the argument. See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'") (citation omitted).

their Convictions and Pleas of Guilty

Jackson contends that the government wrongfully attempted to use two of his co-conspirators' guilty pleas as substantive evidence of his guilt, although he "recognizes that it is not always error to inform a jury as to a co-defendant's guilty plea[,] especially when the jury is given a cautionary instruction" such as the District Court gave here. Appellant's br. at 40. In arguing that the admission of evidence of the guilty pleas was a plain error, Jackson in his brief cites our statement in United States v. Gullo that

> [t]he guilty plea to a conspiracy charge carries with it more potential harm to the defendant on trial because the crime by definition requires the participation of another. The jury could not fail to appreciate the significance of this and would realize . . . that 'it takes two to tango.'

Id. at 41 (quoting United States v. Gullo, 502 F.2d 759, 761 (3d Cir. 1974) (citation omitted)).

We have "repeatedly held that the government may introduce neither a witness's guilty plea nor his or her concomitant plea agreement as substantive evidence of a defendant's guilt." United States v. Universal Rehabilitation Servs. (PA), Inc., 205 F.3d 657, 668 (3d Cir. 2000). Yet, a witness's guilty plea is admissible under Federal Rule of Evidence 403 for at least three purposes: "(1) to allow the jury accurately to assess the credibility of the witness; (2) to eliminate any concern that the jury may harbor concerning whether the government has selectively prosecuted the defendant; and (3) to explain how the witness has first-hand

knowledge concerning the events about which he/she is testifying." Id. at 665. We have noted that

> [w]hen a co-conspirator testifies he took part in the crime with which the defendant is charged, his credibility will automatically be implicated. Questions will arise in the minds of the jurors whether the co-conspirator is being prosecuted, why he is testifying, and what he may be getting in return. If jurors know the terms of the plea agreement, these questions will be set to rest and they will be able to evaluate the declarant's motives and credibility.

United States v. Gaev, 24 F.3d 473, 477 (3d Cir. 1994). We held that "[a]s such, we are satisfied that the government may seek to introduce a witness's guilty plea and/or plea agreement even in the absence of a challenge to the witness's credibility." Universal Rehabilitation Servs. (PA), 205 F.3d at 666.

Here, the government's use of the co-conspirators' guilty pleas was permissible. Co-conspirator Bostick testified while wearing prison attire. Supp. App'x at 240. The prosecutor asked him why he was wearing that clothing and questioned him about the charges against him. Id. at 240-41. The prosecutor then discussed the terms of his guilty plea with him, making the jury aware that Bostick was testifying because of his plea agreement with the hope that he might receive a reduced sentence in return for his testimony. Id. at 241-45. The prosecutor also elicited testimony from Bostick that he had not been guaranteed that he would be given a reduction in sentence for testifying and that he would not perjure himself at the trial. Id. Then, the prosecutor asked Bostick about his prior felonies

29

and drug use.  Id. at 246-51.  After completing that line of questioning, the prosecutor addressed the current case, asking, "Now, you already indicated you pled guilty for your role in a drug trafficking conspiracy, correct?"  Id. at 251.  She then asked a number of questions about the conspiracy before she finally asked about Jackson.  Id. at 251-54.

The prosecutor engaged in the same type of examination of co-conspirator Christopher Stanley.  The prosecutor started her examination of Stanley by asking him about his current incarceration and the charges to which he pleaded guilty.  Id. at 310-11.  She then elicited that he was testifying in the hope that, per his plea agreement, his sentence would be reduced.  Id. at 312-13.  As was the case with Bostick, the prosecutor drew testimony from Stanley recognizing his understanding that the judge, not the prosecution, would determine his sentence, and he could be prosecuted if he lied in giving his testimony.  Id.  After that testimony, he testified about his prior crimes and whether he was in the same jail as other co-conspirators.  Id. at 313-16.  Only then did the prosecutor ask him about his drug trafficking history, at which time he mentioned Jackson.  Id. at 316.

Neither of these uses of the co-conspirators' guilty pleas was impermissible.  The evidence regarding the guilty pleas all went to the heart of whether the co-conspirator witnesses were credible, whether the government selectively was prosecuting Jackson, and whether the co-conspirators had firsthand knowledge of the crime for which Jackson was being tried.  The evidence clearly was not offered as substantive evidence of Jackson's guilt.  Furthermore, the District Court provided an appropriate limiting instruction with respect to the guilty plea evidence at the end of the case.  Id. at 495-96.  Therefore, the Court did not err at all, let alone commit plain error, in allowing

the guilty plea testimony.

3. The Government's Mention of a Co-Conspirator's Fifth Amendment Right Not to Testify

Jackson argues that the District Court made a plain error when, in response to its question about which exception to the hearsay rule applied to the admission of Gilbert's otherwise-hearsay testimony, the prosecutor stated that "[t]he exception is Arthur Gilbert cannot take the stand. He has a Fifth Amendment privilege where the government cannot force him to come in to testify. He is unavailable to this Court and thereby it would be an exception to hearsay." Id. at 253.

We have recognized that it may be improper for a prosecutor to refer to the invocation of a Fifth Amendment privilege to encourage a jury to infer a witness's guilt. See, e.g., Nezowy v. United States, 723 F.2d 1120, 1124 (3d Cir. 1983); United States ex rel. Fournier v. Pinto, 408 F.2d 539, 541 (3d Cir. 1969). "[W]e may reverse" on plain error review, however, "only if we find an error in the prosecutor's comments so serious as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." United States v. Pungitore, 910 F.2d 1084, 1126 (3d Cir. 1990) (internal quotation marks and citation omitted). "[O]ur objective is not to penalize the prosecutor for an inopportune remark, but to ensure that the appellant[] received a fair trial." Id.

Here, the prosecutor's response to the District Court's

31

question about the applicable hearsay exceptions was a failed and incomplete attempt to claim a Federal Rule of Evidence 804 exception which applies when a witness is unavailable based on his invocation of privilege pursuant to Rule 804(a)(1). The Court instead ruled that it was admissible as a statement of a co-conspirator under Evidence Rule 801(d)(2)(E). While the prosecutor's mention of a witness's invocation of the Fifth Amendment in front of the jury was inopportune, the error in the admission of the evidence was not so serious that it was a plain error.

4. The Cumulative Effect of the Aforementioned Actions

Inasmuch as we hold that none of the issues that Jackson raises demonstrates that there was a plain error at his trial, we need not analyze whether the cumulative effect of plain error on the trial requires that we reverse Jackson's conviction.

## V. CONCLUSION

For the foregoing reasons, we will affirm Jackson's judgment of conviction and sentence entered on July 24, 2014.