**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 16-1448, 16-1537 and 16-1644

UNITED STATES OF AMERICA

v.

KEITH HARRIS, a/k/a "Keido", a/k/a "Doe"

Keith Harris,

Appellant in case no. 16-1448

UNITED STATES OF AMERICA

v.

GREGORY HARRIS, JR., a/k/a "G"

Gregory Harris, Jr.,

Appellant in case no. 16-1537

UNITED STATES OF AMERICA,

v.

THOMAS HOPES, a/k/a, Gudda Gunz

Thomas Hopes,

Appellant in case no. 16-1644

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court Nos.:  2-13-cr-00057-002; 2-13-cr-00058-006 and 2-13-cr-00057-001)
District Judge:  Honorable Cathy Bisson

Argued on November 28, 2018

(Opinion filed  September 13, 2019)

Before:  AMBRO, SCIRICA and RENDELL <u>Circuit Judges</u>

Adam B. Cogan
218 West Main Street
Suite A
Ligonier, PA   15658

                Counsel for Appellant Keith Harris

Louise Arkel **(Argued)**
Office of Federal Public Defender
1002 Broad Street
Newark, NJ   07102

Richard Coughlin
Office of Federal Public Defender
Federal Public Defender District of New Jersey
800-840 Cooper Street
Suite 350
Camden, NJ   08102

                Counsel for Appellant Gregory Harris, Jr.

Robert Epstein **(Argued)**
Federal Community Defender Office for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA   19106

                Counsel for Appellant Thomas Hopes

Donovan J. Cocas **(Argued)**
Jane M. Dattilo
Laura S. Irwin
Office of United States Attorney
700 Grant Street
Suite 400
Pittsburgh, PA   15219

Counsel for Appellee

——————

O P I N I O N[*]

——————

**RENDELL**, Circuit Judge:

Greg Harris, Keith Harris, and Thomas Hopes (collectively "Appellants") were indicted for their part in a drug conspiracy that sold and distributed heroin in Homestead, Pennsylvania. They were also indicted for the abduction of an associate, Brent Harber. Appellants went to trial on both charges. After a two-week trial that featured hours of testimony detailing intercepted phone calls between members of the conspiracy, Appellants were found guilty of conspiring to sell and distribute heroin. They were acquitted on the abduction charge. On appeal, Appellants raise eleven issues concerning constitutional violations, erroneous admissions of testimony, claims of insufficient evidence, and sentencing errors. Because none of the issues presented warrant reversal, we will affirm Appellants' convictions and sentences.

——————

[*]This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

**Background**

In April 2012, federal and state law enforcement led by Special Agent Aaron Francis and Task Force Officer Shane Countryman launched an investigation into drug trafficking in the northern side of Homestead, Pennsylvania, known as uptown. The investigation targeted members of an organization that the officers referred to as "uptown crew." The officers identified four subgroups that made up uptown crew, led by Thomas Hopes, Jay Germany, Bryce Harper, and Andre Corbett. Keith and Greg Harris, brothers and housemates, were members of uptown crew.

In September of 2012, officers obtained a warrant to wiretap the phones of Germany and Diamantia Serrano after they completed a controlled buy[1] of heroin from each of the suspects. During that same period, officers identified Lisa Saldana, an owner of a shop in Versailles, Pennsylvania. She admitted to selling stamp bags—the bags used to package heroin—at her store. She also agreed to cooperate with law enforcement by installing a camera in her store and keeping track of all stamp bag sales. At trial, she identified Greg as "G" in a photograph taken from inside her store. Keith and Hopes were also identified in photographs taken from outside the store. Throughout this period, Appellants and other associates purchased stamp bags that the Government contended, if packaged and sold, would have amounted to over a kilogram of heroin.

---

[1] A "controlled purchase" or a "controlled buy" occurs when a person cooperating with law enforcement purchases contraband from a suspect of an investigation. *See* App. 135 (describing the procedure).

4

The wiretap also intercepted conversations between Germany and the Appellants. Greg discussed with Germany stamp bag purchases, heroin quality, and an arrangement to purchase a house that the Government urged was to be used to store drugs and drug paraphernalia. Germany and Hopes discussed heroin sales and prices, and also referred customers to each other. Germany referred a customer to Keith and obtained from Keith Greg's second phone number.

Based on the information obtained from the first round of wiretaps, the officers were authorized to wiretap Hopes' phone for one month. From this one month period, they learned how much heroin Hopes typically sold—acquiring 70 grams of raw heroin in one week, and distributing 63 grams—and who were his customers. One such customer, William McDonald, was arrested for possession of several bricks of heroin based on information obtained from the wiretap.

In January 2013, Keith suspected that a runner[2] of uptown crew, Brent Harber III, had stolen a gun and heroin supplies from his home. Keith, Greg, Hopes, Serrano, as well as Sterling Marshall and Ronnell Robinson, took Brent to an apartment complex, and beat him. He later spoke with officers regarding these events.

Based on the above information, as well as other evidence gathered throughout the investigation, the grand jury issued two indictments. The first indictment, Indictment Criminal No. 13-57 ("Indictment 57"), included five counts. For our purposes, three counts are relevant. Count one charged Hopes and Keith with conspiring with persons

---

[2] A "runner" is a person who takes the heroin from the dealer to the customer, minimizing the dealer's exposure to observable criminal activity. App. 185.

"both known and unknown" to possess with intent to distribute at least one kilogram of heroin from in and around May 2012 to in and around March 2013. Count two charged Hopes, Greg, Keith, and Ronnell Robinson with using a firearm in relation to a drug-trafficking crime between December 31, 2012 and January 3, 2013, describing the abduction and beating of Brent Harber. And count four individually charged Hopes with possessing with the intent to distribute and distributing the heroin seized from McDonald on December 18, 2012.

The second indictment, Indictment Criminal No. 13-58 ("Indictment 58"), charged Greg with conspiring with persons "both known and unknown" to possess with the intent to distribute and distributing at least one kilogram of heroin from in and around April 2012 until in and around February 2013. Other members of the conspiracy were charged in Indictments 57 and 58, and most pled guilty. As a result, the Government moved to consolidate the trials for the remaining defendants—Hopes, Keith, Greg, and Ronnell Robinson.

At trial, the Government called thirty-one witnesses. The testimony of three witnesses is relevant to the issues on this appeal.

Officer Caterino testified as the local law enforcement officer who initially requested assistance from the FBI to investigate heroin trafficking in Homestead by the uptown organization. Officer Caterino testified extensively regarding his personal surveillance of the defendants. On one occasion, he surveilled the residence of Keith and Greg. During that period, he identified several unidentified men enter the Harris' home, exit shortly after, walk to the nearby playground, and engage in a hand-to-hand

6

transaction. Officer Caterino also testified to the arrest of William McDonald, who was connected to Hopes through the wiretap. Two days later, after McDonald was released, Officer Caterino testified that he saw him again at the Harris' residence. Greg Harris Joint Appendix 764 (Hereinafter "App."). One day later, Caterino testified that he also saw Hopes at the Harris' residence. In addition, Caterino testified, based on his years working in Homestead, about the existence of "uptown crew." He identified the defendants in a series of photographs taken from rap videos posted on YouTube that he personally uncovered. Within the rap videos, there are repeated references to "uptown," as well images of individuals making "U signs" with their index and pinky fingers and wearing University of Miami apparel. App. 772.

The Government also called Special Agent Francis. Francis along with Task Force Officer Countryman "managed the investigation, made all the investigative decisions, and worked with the other agents, federal and local law enforcement, to run the investigation." App. 114. Francis, with the assistance of Detective Caterino, "identified multiple locations where the individuals of this organization sold heroin from," and "would physically go out, observe those locations, try to get a daily pattern of activity, [and] observe the individuals selling heroin." App. 117. He personally reviewed telephone data to "get a better understanding of the pattern of activity of the organization as well as to identify associates and members of the organization." App. 118. As the case agent he "personally participate[d]" in all of these steps. *Id.* Throughout the course of the investigation, he specifically reviewed the majority of phone calls obtained through the Title III wiretap, listening to "[t]ens of thousands" of calls. App. 126.

Based on his involvement in the case, Francis testified regarding the nature of the uptown organization. He testified that the initial goal of the investigation was to "identify members and associates of Uptown, dismantle that heroin-trafficking organization, as well as identify their sources . . . of heroin both in and out of state." App. 115. Francis testified that uptown members associated with each other "by making a fist with the index finger and the little finger pointed up in the shape of a U for Uptown. They would also wear University of Miami clothing primarily with the large U symbol on it." App 115–16. Francis further testified that they were able to identify "four subsets within the Uptown organization. Each had a distinct source of supply. Some of them shared the same source of supply, but they all had one person within each subset that had access to that source of supply." App. 184. These subsets "often work[ed] together. If one group didn't have heroin at a particular time for their customer, they would often contact either a runner or somebody else in another group to either deliver heroin to their customer or obtain heroin[.]" App. 185.

In addition to testimony regarding the nature of the organization, Francis interpreted phone calls between Appellants and other members of uptown crew to provide information regarding the quantity of heroin sold. Francis interpreted code words for the jury, including "breezo" as a "brick" which equals 50 bags of heroin (each bag containing .02 grams), "B" as a bundle which equals 10 bags, and "snap" as a customer, among other terms. *See* App. 209-10. With each call, Francis provided an estimate of the amount of heroin sold by the participants in the call, based on his interpretation of the code words. Francis specifically testified to Hopes' drug transactions

8

during an 8-day period. He testified that Hopes sold "approximately 70 grams" of heroin based on his interpretation of the calls, and that the 8-day period "was a normal week of heroin sales." App. 272–74.

TFO Countryman also testified regarding his role in the investigation. He identified nicknames of defendants and participants on phone calls, and he interpreted code words used in those phone calls. Countryman's primary testimony interpreted phone calls between Jay Germany and Hopes, *see* App. 367–69, Hopes and Keith, *see* App. 392–96, Germany and Greg, *see* App. 370–75, 385–88, and James Walker and Greg Harris, *see* App. 1289–96. Like Francis, Countryman provided context for the jury by defining vague or coded terms in each of the phone calls. Such testimony identified the relationships between each of the Appellants and their roles in the larger organization.

In addition to the three officers, Lisa Saldana testified pursuant to a cooperation agreement and explained her role in the investigation. She identified Greg Harris as "G," and noted that on August 19th, 2012, he and another man, Rico, each purchased ten boxes of stamps.[3] App. 1034–35. Saldana testified that on September 15, 2012, Greg came to the store with another man, "P", and each purchased ten boxes of stamp bags. App. 1035–36.

Defendants Keith and Hopes were found guilty of count one of Indictment 57, conspiring to possess with intent to distribute at least one kilogram of heroin. Hopes was

---

[3] Ten boxes of stamps would amount to 6000 stamp bags. App. 382 (equating one box to 600 stamp bags). Using the conservative estimate of Agent Francis at .02 grams of heroin per bag, *see* App. 226, ten boxes would amount to 120 grams of heroin.

9

also found guilty of count four of Indictment 57, possessing with the intent to distribute and distributing heroin seized from McDonald. And Greg was found guilty of the lesser included offense of count one of indictment 58, conspiring to possess with the intent to distribute at least 100 grams of heroin. All defendants were acquitted of count two of indictment 57, the abduction charge.

At sentencing, the District Court sentenced Keith to 240 months' imprisonment. The Court increased his baseline offense level by two levels for using violence during the abduction and assault of Harber, and further increased it by three levels as a manager or supervisor of criminal activity involving five or more participants. Finally, there was an additional two-level increase for maintaining a home for the purpose of distributing heroin. *See* U.S.S.G. § 2D1.1(b)(12).

The District Court sentenced Greg under the Guidelines to 121 months' imprisonment, applying a two-level enhancement as a result of his involvement with the abduction of Brent Harber. The Court did not enhance Greg's sentence for distributing more than a kilogram, as it concluded the evidence presented at trial indicated he helped distribute 400 to 700 grams of heroin.

The Court sentenced Hopes to 288 months' imprisonment, as he was found by the jury to have conspired to distribute more than a kilogram of heroin.

Keith, Hopes, and Greg subsequently appealed, and their appeals have been consolidated for our review.

**Analysis**[4]

Appellants raise eleven issues for appeal. We will divide those issues into four categories: (1) Constitutional; (2) Evidentiary; (3) Sufficiency of Evidence; and (4) Sentencing. We will address each category and issue.[5]

**I.  Constitutional Issues**

1. *The prosecutor did not constructively amend the indictment when it put forth evidence regarding "one overarching conspiracy."*

Greg and Hopes argue that the Government used the evidence of heroin distribution from both indictments to convict them by making repeated references to "one overarching conspiracy." The effective combination of the two indictments, Greg and Hopes argue, amounts to a constructive amendment. Because they failed to raise this issue in the District Court, we review for plain error. *See United States v. Daraio*, 445 F.3d 253, 259 (3d Cir. 2006).

"The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment." *Stirone v. United States*, 361 U.S. 212, 218–19 (1960). A constructive amendment occurs when "the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the

---

[4] The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291.

[5] Because not all parties raise each issue, where Appellants are identified by their particular name, it is to note the specific Appellant who raised the issue; otherwise, where we use "Appellants," all Appellants have raised the issue.

defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *Daraio*, 445 F.3d at 259–60. A constructive amendment is different from a variance, "where the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* at 261 (quoting *United States v. Castro*, 776 F.2d 1118, 1121 (3d Cir. 1985)) (internal quotation marks omitted). While a constructive amendment is "presumptively prejudicial under plain error review," *id.* at 260 (quoting *United States v. Syme*, 276 F.3d 131, 136 (3d Cir. 2002)), an appellant must prove a variance is prejudicial, *id.* at 262.

The Government's references to one overarching conspiracy did not constitute a constructive amendment, because the essential terms and elements of the individual charges were not changed. For Keith and Hopes in Indictment 57, and Greg in Indictment 58, they were charged with conspiring with associates *both known and unknown* to sell and distribute one kilogram of heroin. The dates covered by the indictment lend further support to the overarching nature of the conspiracy; they overlap but for a month at the start and a month at the end of the charged conspiracies. Thus, the District Court did not plainly err when it allowed the Government to present evidence regarding "one overarching conspiracy" because such an argument did not change the fact Greg and Hopes were each indicted for a broad conspiracy to sell heroin. For the same reason, the evidence presented did not impermissibly vary from the facts alleged at trial; they had sufficient opportunity to prepare a defense related to the broad conspiracy based on the evidence presented in each indictment.

12

*2. The District Court did not violate Keith's Sixth Amendment Right to Counsel when it ordered counsel to not inform Appellants of the date of Brent Harber's and Tonya Morton's testimony.*

At the end of testimony on Friday, the Government requested a sidebar without Appellants present to notify the Court that it intended to call Brent Harber and Brent's mother, Tonya Morton, the following Monday. After the indictment, their home had been spray-painted with the word "uptown," and a person shot at Brent in Homestead. As a result, the Government requested that defense counsel not inform their clients that Harber and Morton would testify on Monday for fear of ramifications over the weekend. Counsel for Keith objected on Sixth Amendment grounds, which was overruled. The Court ordered that "in the interests of their safety, the Court instructs counsel not to inform their clients of *the date* of Mr. Harber's and his mother's testimony." App. 572 (emphasis added). Defense counsel was otherwise free to discuss trial strategy, including the testimony and cross-examination of Harber and Morton. Keith argues that the District Court violated his Sixth Amendment right to counsel by prohibiting his attorney from discussing with him the specific date Brent Harber and his mother would testify.

The Sixth Amendment provides "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. Amend. VI. The Supreme Court has twice addressed restrictions on attorney-client communication. In *Geders v. United States*, the trial court prohibited communications between the defendant and attorney during an overnight recess because the defendant was on the stand about to be cross-examined. 425 U.S. 80, 82 (1976). The Court found such a

13

restriction unconstitutional because "recesses are often times of intensive work, with tactical decision to be made and strategies to be reviewed." *Id.* at 88. The Court also noted that "there are other ways to deal with the problem . . . short of putting a barrier between client and counsel for so long a period as 17 hours." *Id.* at 89. In *Perry v. Leeke*, the Court held that a restriction on counsel's ability to communicate with the defendant was valid during a fifteen-minute break while the defendant was on the stand. 488 U.S. 272, 283–84 (1989). Thus, not all restrictions on attorney-client communication violate the Sixth Amendment right to counsel. *See United States v. Cronic*, 466 U.S. 648, 658–59 (1984) ("Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.").

The restriction here, unlike the restrictions in *Geders* and *Perry*, was not a total bar on communication between Keith and his attorney. Rather, it restricted Appellants' access to a specific piece of information in light of safety concerns represented to the Court by the Government. Because the Court found the safety of the witnesses to be a compelling countervailing interest, and the restriction was so narrowly tailored as to not affect "the reliability of the trial process," *id.* at 658, the Sixth Amendment was not violated.

3. *The Court did not violate the Sixth Amendment Confrontation Clause when it permitted Francis and Countryman to rely in part on information from informants when testifying.*

In the context of investigations, information collected from informants poses a particular set of problems under the Sixth Amendment's Confrontation Clause. Investigators often rely on informants to gather crucial evidence about the ongoing

14

criminal conduct. But when the government seeks to admit "testimonial" informant statements at trial without putting the informant on the witness stand, the defendant's Sixth Amendment confrontation right may be violated. *See, e.g.*, *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007) ("[Testimony that] communicate[s] out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury" may violate the Confrontation Clause.).

Keith argues that Countryman and Francis identified him as having the nicknames "Keydo," "Keido," and "Doe" through informants. Thus, he argues that relaying the information that "Keith is known as Doe" violated the Confrontation Clause. Because Keith objected to the admission of this testimony on Confrontation Clause grounds, we review de novo. *See United States v. Hendricks*, 395 F.3d 173, 176 (3d Cir. 2005). To the extent the Court erred by admitting the testimony, we "will affirm if we find that the error is harmless beyond a reasonable doubt." *United States v. Helbling*, 209 F.3d 226, 241 (3d Cir. 2000).[6]

Although Keith is correct that Countryman and Francis identify "informants" as a basis for establishing nicknames and associated phone numbers, that analysis is incomplete. Agent Francis testified that the first step in the investigation was to "me[e]t with Detective Caterino to obtain as many of the individuals that he had identified as

---

[6] The Dissent appears to raise a Rule 701 violation pertaining to this issue on Keith's behalf. Keith did not argue the testimony violated Rule 701 in his initial briefs to the court, nor did he raise a Rule 701 violation in his supplemental brief. We thus choose to analyze this issue under the framework provided: The Sixth Amendment's Confrontation Clause. *See United States v. Pelullo*, 399 F.3d 197, 201 n.2 (3d Cir. 2005) ("Where, as here, an appellant fails to raise an issue in an appellate brief . . . it is deemed waived.").

targets. We then spoke with cooperating informants to gather phone numbers." App. 116.

Francis then testified to the process of identifying what member of the conspiracy had which phone number, and the relevant nicknames associated with each member. He testified that

> sometimes the phones are registered in their names. Other times we get that initial information from an informant and corroborate it through, as I said before, a traffic stop where we identify the person. Surveillance may observe the person on a phone at a certain time and we can match it up with pen and toll records to determine who was using that phone at that time. During the actual wiretap we become very familiar with their voices. If somebody stops using a phone that we're monitoring and then we hear that same person with a different number, we're able to corroborate it that way.

App. 125–26. Later, when the Court asked Francis, "[h]ow do you know this is Keith Harris [in the phone call], Agent?" he responded, "we identified his phone number through previous calls during the wiretap and through informants and local law enforcement." App. 247. Countryman testified to a similar process:

> [W]hen we're going to do a wiretap, obviously we want to show who these people—this target telephone is talking to and we need to show that, you know, we have reason to believe that if we intercept this telephone, that there's going to be criminal activity on it. So again—and part of analyzing this and speaking with confidential informants, doing search warrants on telephones after arresting someone, you know, there's multiple ways that we get co-conspirator, for lack of a better term, or associates' phone numbers within this organization. So that's one of the things that we look for. I'm going to look for co-conspirators that I know are associated with this organization and a pattern that shows that they're speaking to each other.

App. 346–47. Based on that testimony, Keith argues that Francis and Countryman conveyed an out-of-court statement from informants that tied Keith to his phone number and associated him with the nicknames. But Keith's argument that Francis and Countryman relied on testimonial statements ignores the extensive non-testimonial

16

evidence that the government admitted that ties him to his phone number and the nicknames. *See Hendricks*, 395 F.3d at 181 ("[S]urreptitiously monitored conversations and statements contained in the Title III recordings are not 'testimonial' for purposes of *Crawford*."); *see also id.* (quoting *United States v. Robinson*, 367 F.3d 278, 292 n.20 (5th Cir. 2004)) ("[T]he statement challenged as hearsay was made during the course of the conspiracy and is non-testimonial in nature."). Here, the Government offered into evidence numerous phone calls that identify Keith as "Doe" and associate him with the phone number ending in 8745. In one phone call, "G," who uncontroverted evidence identified as Greg Harris, was identified repeatedly as "Doe's Brother."[7] App. 1985. In another phone call between Keith and Hopes, Hopes stated, "I'm mad as hell, though, Keido" and "Nah, but Doe we got to find out who was doing this[.]" App. 2191. And in a third call, Hopes gave out "Doe's" number, the same number associated with Keith, to an unidentified male. App. 2034–35. Thus, contrary to Keith's claim that the Court admitted testimonial statements from informants, the evidence suggests that, even if the initial investigation involved informants, Francis and Countryman relied on non-testimonial evidence based on their involvement in the wiretaps and surveillance to conclude that Keith is "Doe."

Thus there is no constitutional error.

---

[7] Keith argues that this phone call cannot serve as the basis for his identification because the wiretap establishes that the participants use "bro" and other terms to describe someone who is not their relative. We disagree. The phone call establishes that Brady Hall is attempting to identify "G" for James Walker. In that context, Hall goes on to identify "G" as "Doe's brother" four times. The use of "Doe's brother" as an identifier is helpful to Walker because it means "G is the brother of Doe."

## II. Evidentiary Issues

The evidentiary issues presented concern Federal Rule of Evidence 701, which permits lay witnesses to offer opinion testimony if it meets three requirements. *First*, it must be "rationally based on the witness's perception" of events. Fed. R. Evid. 701(a). That is to say, the testimony must be based on "personal" or "first-hand" knowledge. *United States v. Fulton*, 837 F.3d 281, 291 (3d Cir. 2016). *Second*, the testimony must be helpful by "describing something that the jurors could not otherwise experience for themselves[.]" *Id. Third*, the testimony cannot be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). If it is based on such knowledge, then the witness needs to be qualified as an expert.

There are three categories of evidence Appellants argue violated Rule 701: (1) Testimony by Countryman interpreting phone calls that the jury did not need help interpreting; (2) Testimony from Francis and Caterino regarding the existence of the "uptown crew"; and (3) Testimony from Francis interpreting one week of Hopes' heroin transactions as "a normal week of heroin sales generated by that particular phone." App. 274. We review each category.

### 1. The Court did not plainly err by admitting Countryman's testimony.

At several points, Countryman's testimony interpreted non-coded terms when he may have been "no better suited than the jury to make the judgement at issue." *Fulton*, 837 F.3d at 293 (quoting *United States v. Meises*, 645 F.3d 5, 16 (1st Cir. 2011) (internal citations and quotation marks omitted)). For one, Countryman interpreted "sh*t I f*ck with," in a conversation between Greg Harris and Thomas Hopes, to mean heroin, and

18

informed the jury that based on "[his] investigation" "all [Hopes] sold was heroin." App. 536–37.  On another occasion, Countryman interpreted "box" to be a "box of empty stamp bags," and "[h]e grabbed ten" to mean Keith "grabbed ten boxes of 600 empty stamp bags," App. 1319. While these calls used vague terms, those terms were not coded such that he could surmise some meaning that the jury could not.  In *United States v. Jackson*, we held an agent's testimony violated Rule 701 when it interpreted non-coded conversations so as to imply criminal conduct. 849 F.3d 540, 554 (3d Cir. 2017). Here, similarly, Countryman's interpretation of the non-coded conversations suggested that he had "other evidence" of criminal conduct not before the jury that informed his testimony. *See id.*; *see also United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013) (testifying agent "spoon-fed" interpretations of the phone calls); *United States v. Hampton*, 718 F.3d 978, 983 (D.C. Cir. 2013) (testifying agent interpreted phone calls based on "the entire investigation," relying on evidence not in front of the jury).

Countryman also relied on "specialized knowledge" that falls under Rule 702's expertise requirement, and is not within lay testimony governed by Rule 701. Countryman interpreted a conversation between Jay Germany and Greg Harris discussing a house that "[they] don't gotta keep all the utilities on . . . [because] we ain't gonna be livin[g] [there]." App. 1988. Countryman informed the jury that this is a "stash house" because "they're discussing no[t] actually putting utilities on, putting the gas on, but putting it in another person's name, which is very common for a stash house[.]" App. 386–87. Such an understanding of the term "stash house" is not merely lay opinion that

19

relies on "sensory and experiential observations" of the phone call itself. *Fulton*, 837 F.3d at 291 (internal citation omitted). Rather, it is expert testimony.

Although contrary to the rules of evidence, the District Court's failure to *sua sponte* exclude pieces of Countryman's testimony did not constitute plain error. The result might be different if the Court had the benefit of our opinion in *Fulton*, where we concluded that an agent's interpretation of non-coded phone records violated Rule 701. *Id.* at 293. But we held in *Jackson*, "[i]nasmuch as we decided *Fulton*, a case that would have been useful to the Court, after the trial in this case had concluded, the Court did not have the benefit of that opinion at the trial." 849 F.3d at 555. Similarly, here, the trial took place before our decision in *Fulton*. Absent *Fulton*, the errors here did not meet the first prong of the plain error requirement, that is, they would not have been plainly or obviously improper to the trial court.[8] Thus, the District Court did not plainly err when it failed to sua sponte exclude Countryman's testimony.

2. *Francis' testimony that a one-week period of drug sales was "a normal week" for Hopes was harmless error.*

Hopes argues that Francis' testimony regarding drug quantity was improper when he stated that "this was a normal week of heroin sales generated by that particular phone," App. 274, because he only testified to one week of phone calls, and the other three weeks

---

[8] The Dissent urges that we have consistently interpreted Rule 701 to exclude such testimony. Dissenting Op. at 14–15 (citing *United States v. Dicker*, 853 F.2d 1103, 1109 (3d Cir. 1988)). In *Jackson*, we held to the contrary, recognizing that *Fulton* significantly clarified the state of Rule 701 violations. We thus decline to part ways with that conclusion here.

of calls were not admitted into evidence.[9] This kind of conclusory testimony violates Rule 701, as it effectively fails to give the jury sufficient evidence to evaluate Francis' testimony. Were this kind of testimony "to be accepted, there would be no need for the trial jury to review personally any evidence at all." *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004).

Although improper, we will uphold its admission if it was "highly probable that [the] evidentiary error did not contribute to conviction." *United States v. Ali*, 493 F.3d 387, 392 n.3 (3d Cir. 2007) (citing *Gov't of Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir. 1976)). Here, it is highly probable the error did not contribute to the conviction. Through cross-examination, defense counsel made clear that the testimony was only Francis' interpretation of the phone calls. *See, e.g.*, App. 278 ("Agent Francis, that sort of correction that we just made, that sort of exhibits the problem sometimes with interpretation of calls, right? It's not the easiest thing to do and sometimes you can be off, right?"); App. 242 (stating on direct, "[w]hat's *your interpretation* of the quantity of heroin in that call?") (emphasis added). The Court further limited the impact of Francis' testimony by offering a limiting instruction making clear that the testimony is Francis' own opinion and the jury "should [give] whatever weight [it] think[s] is appropriate given

---

[9] The parties dispute the appropriate standard of review for Francis' testimony regarding drug quantity. Because we believe the objection—"it assumes facts not in evidence; and without putting those calls in, you know, that's an improper opinion to speculate on"— properly preserves a Rule 701 objection, we will review for abuse of discretion and harmless error. *See, e.g., Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 224 (3d Cir. 2008) (concluding "Objection. No foundation. Calls for speculation. Not an expert witness" to preserve a Rule 701 objection).

all the other evidence in this case[.]" App. 257. In closing argument, the Government stressed the *stamp bag* sales, which if packaged and sold, exceeded the kilogram quantity. *See, e.g.*, App. 1599–1607 (describing the timeline of stamp bag sales that, if sold, amount to over 1.5 kilograms of heroin). In light of the evidence presented, it is highly probable the jury concluded, based on stamp bag sales alone, that Hopes conspired with others to sell more than a kilogram of heroin, even with the erroneous testimony asking Francis to extrapolate.

3. *Although Francis' initial testimony regarding the existence of "uptown crew" may have been improperly admitted without a proper foundation, that admission was harmless in light of Francis' later testimony and Caterino's testimony.*

Greg and Hopes argue that the testimony of Caterino and Francis regarding the nature of "uptown crew" and an "overarching conspiracy" violated Rule 701. Rule 701's permissive stance towards lay opinion testimony "assumes that the natural characteristics of the adversary system will generally lead to an acceptable result, since the detailed account carries more conviction than the broad assertion, and a lawyer can be expected to display his witness to the best advantage. If he fails to do so, cross-examination and argument will point up the weakness." Fed. R. Evid. 701, Notes of Advisory Committee on Proposed Rules. Thus, once the foundational requirements of Rule 701 are met—*i.e.,* the testimony is based on the witness's perception, helpful to the jury, and not based on

22

specialized knowledge—the District Court does not abuse its discretion by admitting the testimony.

Francis, the first witness in the case, testified that he, along with Countryman, "managed the investigation, made all the investigative decisions, and worked with the other agents, federal and local law enforcement, to run the investigation." App. 114. He testified that he was initially brought in to investigate "a heroin trafficking organization known as Uptown that was based primarily in the Homestead/Munhall area," and that the goal of the investigation was to "identify members and associates of Uptown, dismantle that heroin-trafficking organization, as well as identify their sources of supply both of heroin both in and out of state." App. 115. Francis then proceeded to testify about the structure of the organization, noting that "[t]he Uptown was a group of individuals based again primarily in Homestead and Munhall. They generated income for the organization or for themselves by trafficking heroin and other narcotics at times. They would primarily associate with each other by making a fist with the index finger and the little finger pointed up in the shape of a U for Uptown. They would also wear University of Miami clothing primarily with the large U symbol on it." App. 115–16. The District Court overruled counsel's objection that urged that the proper foundation had not been laid for these conclusions. In doing so, the District Court likely abused its discretion by admitting that testimony without any proper foundation. *See, e.g., United States v. Garcia*, 413 F.3d 201, 210–11 (2d Cir. 2005) (rejecting an agent's identification of the defendant as a "partner" in the drug conspiracy after background testimony). At that point, Francis had

23

only discussed his general role in the investigation before proceeding to the bases for his opinion about the existence of an uptown crew.

That error, however, is clearly harmless. Moments after Francis gave that testimony, he described his personal involvement in the case: "Yes, we would, after we—with the assistance of Detective Caterino, we identified multiple locations where the individuals of this organization sold heroin from. We would physically go out, observe those locations, try to get a daily pattern of activity, observe the individuals selling heroin. We would work with informants to conduct controlled purchases of heroin to confirm that what—what we were being told or what they were actually selling was heroin." App. 117. He indicated that he and Countryman identified "two types of telephone data" which helped "us to get a better understanding of the pattern of activity of the organization as well as to identify associates and members of the organization." App. 118. He testified that he personally participated in all of these steps. *Id*. In total, he personally spent "[h]undreds" of hours on the investigation. App. 119. In addition to that testimony, and before any more testimony regarding the nature of uptown, Francis also described in detail his involvement with the wiretaps. He testified that "[w]hen we monitor the wiretap . . .[t]he call comes in, we're monitoring it, and it's pertinent, appears to be a drug transaction, we will radio to the surveillance team, have them put eyes on it in an effort to identify any parties participating, and generally corroborate what we're hearing on the phone." App. 121. He testified that he personally "was in the wire room reaching out to the surveillance team, and there were times when [he] was on the

surveillance team[.]" *Id*. Through the course of the investigation, he listened to "[t]ens of thousands" of calls. App. 126.

Taken together, any concern that Francis' testimony may have not been based on his personal observations was clearly eliminated. Moreover, Detective Caterino testified to his personal observations that corroborated Francis' testimony. Caterino testified that he worked in Homestead for years, and that he "kn[e]w the Harris brothers, [and] . . . knew their father." App. 753. He also knew "the other two [defendants] . . . from working the area." *Id.* As part of the investigation, Caterino "conducted surveillance, listened to wiretaps, made arrests, search warrants." App. 754. Caterino worked "[a]t least 1500" hours on this case. *Id.* And prior to his discussion of uptown, Caterino recounted his personal involvement in the investigation, including surveillance of the neighborhood, the Harris' residence, and Hopes. *See United States v. Gadson*, 763 F.3d 1189, 1209 (9th Cir. 2014) (concluding that the officer's personal experience, *i.e.*, "searches of the Fouts house, the multi-day surveillance of the Gillam Way house, the search of the Gillam Way house, and the review of around 100 hours of prison phone calls" laid the foundation for his testimony interpreting coded terms). Caterino proceeded to testify that he observed "[y]oung black males wearing the Miami University hoodie or hat, the U, that was on the basis through the Boroughs, and [he] also observed it on YouTube videos." App. 767. The Government admitted into evidence photographs of the YouTube videos where Caterino positively identified Greg Harris, Keith Harris, Thomas Hopes, Jay Germany, and other members of the conspiracy. App. 775–85. Based on that personal knowledge, Caterino's testimony was clearly helpful to the jury, as it identified a non-obvious

25

relationship between the defendants, which the jury could then use to conclude that the defendants are not merely arms-length negotiators selling heroin in the same neighborhood.[10]

Appellants rely on the Court of Appeals for the D.C. Circuit's opinion in *United States v. Slade*, 627 F.2d 293 (D.C. Cir. 1980), to argue that such testimony is impermissible. There, the Court concluded that repeated references to "Stampede's [the defendant's] dope" and "Stampede's organization" violated Rule 701 because it placed the defendant at the center of the conspiracy without laying any foundation for that conclusion. *Id.* at 305. In *Slade*, no such foundational evidence was presented and the moniker of the organization bore the very name of the defendant. *See id*. Here, a proper foundation was laid for the existence of such an organization, and the testimony did not label the conspiracy with the name of the Appellants. Francis and Caterino testified to their experiences as part of the investigation, including surveilling the neighborhood, participating in controlled buys, and conducting wiretaps. All of the personal experience

---

[10] The Dissent urges that "Caterino never explained the specific observations, statements, or other perceptible facts from which he determined the existence of a cohesive 'Uptown' organization," Dissenting Op. at 4. But Caterino consistently testified that he observed these young men in the neighborhood known as uptown wearing University of Miami apparel and making the U sign with their hand. Caterino also detailed his role in the investigation by specifically describing several days of surveillance and explaining how he discovered the YouTube videos that include the same hand signs, hoodies, and references to "uptown." App. 768–84. The Dissent suggests that this could be a "benign reference to the neighborhood in Pittsburgh," Dissenting Op. at n.2, and that the Government affixed this label onto the conspiracy. But unlike instances where "the jury had no way of verifying [the agent's] inferences," *Hampton*, 718 F.3d 978, 983 (D.C. Cir. 2013), Caterino based his opinion on evidence presented in the record, from which the jury was free to reject or to draw a more benign inference.

laid the foundation for the opinion testimony that "uptown crew" existed. Thus, any error by the District Court in admitting the initial trial testimony regarding "uptown crew" was harmless.

The Dissent suggests that our decision parts ways with the Second Circuit's opinions in *United States v. Mejia* and *United States v. Garcia*. We disagree. In *Mejia*, an investigator with no personal involvement in the case was qualified as an expert witness under Rule 702. 545 F.3d 179, 186 (2d Cir. 2008). The principal concern there, unlike here, was that the investigator "was proffered and testified in the case before us only as an expert. Those parts of his testimony that involved purely factual matters, as well as those in which [the investigator] simply summarized the results of the Task Force investigation, fell far beyond the proper bounds of expert testimony. [The investigator] was acting as a de facto 'case agent' in providing this summary information to the jury[.]" *Id.* at 196. Here, rather than imbuing the agent's testimony with elevated legitimacy by admitting him as an expert, the District Court permitted the actual case agent personally involved in the investigation to testify based on his perceptions.  Nor does our decision part ways with *Garcia*. *United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005). There, the agent had testified that Garcia was a "partner" but gave no personal observations that supported that conclusion as to his culpability. *Id.* at 210. While an agent is not free to give summary testimony based on the observations of others, a

27

foundation can be laid through an agent's extensive personal involvement in a case.[11]

Here, such a foundation was laid.

### III. Sufficiency of Evidence

When faced with a challenge to the sufficiency of evidence, we will sustain a verdict "if 'any rational juror' could have found the challenged elements beyond a reasonable doubt, viewing the evidence in the manner that is most favorable to the Government, neither reweighing evidence, nor making an independent determination as to witnesses' credibility[.]" *United States v. Peppers*, 302 F.3d 120, 125 (3d Cir. 2002) (quoting *United States v. Cothran*, 286 F.3d 173, 175 (3d Cir. 2002)). In light of this demanding standard, we conclude that Appellants' convictions were supported by sufficient evidence.

Greg argues that the evidence was insufficient to establish that he conspired with others to distribute more than 100 grams of heroin because the Government failed to establish a "joint objective to commit the underlying offense[.]" *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986). He urges that all the Government can establish is a

---

[11] While the Dissent makes a valid point that agents cannot testify and provide conclusions that were not actually based on their own perception, here, that is not the case. Tellingly, defense counsel did not cross-examine the agents regarding the lack of their personal knowledge—which would be expected if that weakness was in fact present. The Dissent's assertion that we approve of an agent's testimony to "opine under FRE 701 about the existence, structure, emblems, objectives, and membership of the supposed Uptown Crew based generally on his investigation of appellants," Dissenting Op. at 3–4, rings hollow when one looks at the course of the trial, the obvious extensive personal involvement of these two witnesses, and their testimony regarding their perceptions. These are not general assertions, but rather, observations that the jury had no reason to second guess based on the extensive evidence presented.

buyer-seller relationship and arms-length transactions with others. We disagree. A rational juror could find "that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding." *Id.* (quoting *United States v. Ellis*, 595 F.2d 154, 160 (3d Cir. 1979)). Greg often purchased stamp bags in bulk and lent them to others. *See* App. 1907–08. He often went to purchase stamp bags with others. *See* App. 1033–34. Greg spoke in code with Germany. App. 1900-03. And Greg discussed renting a house to store heroin with Germany and Hopes. App. 1988-91.  Taken together, and viewing the evidence in a light most favorable to the Government, a rational juror could find Greg conspired with others to sell heroin.

Keith contests both the fact of the conspiracy and the amount of heroin that can be attributed to him. But the Government presented ample evidence that Keith both conspired to distribute drugs and distributed more than a kilogram. Hopes and Keith purchased stamp bags together, *see* App. 2189-90, and sold heroin together, *see* App. 2188 ("we moved [seven bricks] today"). One such day of stamp bag purchases could have packaged roughly 360 grams of heroin. *See* App. 1607 (converting 30 boxes purchased by Hopes and Keith to 360 grams of heroin). There is also evidence that they worked with others, including Bryce Harper and James Walker. Taken together, a rational juror could find that Keith conspired to distribute in excess of a kilogram of heroin.

Hopes likewise challenges the verdict for insufficient evidence. But there is ample evidence that Hopes and Keith worked together, that Hopes bought raw heroin from Walker and had been "grabbin[g] so much," App. 2084, and that Hopes and Germany

sent customers to each other, App. 1911. As a result, a rational juror could connect Hopes to enough participants to establish that Hopes conspired to distribute in excess of a kilogram of heroin.

## IV. Sentencing Claims

Keith and Greg each challenge the District Court's decision to enhance their sentences. Keith challenges the finding that he operated a stash house, as well as the District Court's interpretation of a "stash house." Greg challenges the District Court's finding that he used violence during the offense. "We exercise plenary review over [a] [d]istrict [c]ourt's interpretation" of the United States Sentencing Guidelines ("Guidelines"). *United States v. Zabielski*, 711 F.3d 381, 386 (3d Cir. 2013). We review a district court's factual findings at sentencing for clear error. *See id.* Our goal is "to ensure that a substantively reasonable sentence has been imposed in a procedurally fair way." *United States v. Tomko*, 562 F.3d 558, 566 (3d Cir. 2009) (en banc) (quoting *United States v. Levinson*, 543 F.3d 190, 195 (3d Cir. 2008)).

1. *The District Court did not err when it enhanced Keith's sentence for operating a stash house.*

The Guidelines permit a district court to increase a defendant's sentencing range by two levels "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance[.]" U.S.S.G. § 2D1.1(b)(12). The Guidelines clarify that "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises[.]" U.S.S.G. § 2D1.1 n.17. The District Court found that

30

"heroin was frequently sold out of [Keith's] home," he often "brought large quantities of drugs" back to the home, and he frequently mixed raw heroin with diluents in the home. Joint Appendix of Keith Harris 2600. Based on these findings, the District Court concluded, "notwithstanding the fact that this was Keith Harris's residence, that one of his primary or principal uses of the residence was the manufactur[ing] and distribution of heroin." *Id.*

The District Court did not clearly err when it made the above findings. And those findings, standing on their own, are sufficient to find that a primary purpose for the house was to manufacture and distribute drugs, even if Keith also lived there. *See, e.g., United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012) ("[The stash-house enhancement] applies when a defendant uses the premises for the purpose of substantial drug-trafficking activities, even if the premises was also her family home at the times in question."). Thus, we will not disturb the District Court's decision to apply the stash-house enhancement to Keith Harris.

2. *The District Court did not err when it enhanced Greg's sentence for using violence.*

A district court may enhance a defendant's sentencing range by two levels "[i]f the defendant used violence, made a credible threat to use violence, or directed the use of violence." U.S.S.G. § 2D1.1(b)(2). At Greg's sentencing hearing, the Court found that he was involved in the assault of Brent Harber, crediting Brent's testimony as well as corroborating evidence, including finding Brent's blood on Greg's sweatshirt. Greg now argues that the Court erred because the assault was related to *Keith's* drug conspiracy,

31

which the Court concluded Greg had no part in. Greg argues that we must remand because the Court failed to make any finding that the assault was related to *Greg's* drug conspiracy.

Because he failed to raise this argument below, we review for plain error. *United States v. Flores-Mejia*, 759 F.3d 253, 255 (3d Cir. 2014). Here the Court did not err, let alone plainly err, by enhancing Greg's sentence for use of violence. There is sufficient evidence that the assault was "relevant conduct" related to "the offense of conviction." U.S.S.G. § 1B1.1 n.1(I) (defining "offense"). Brent stole from Keith and Greg's home during the timeframe of *Greg's* conspiracy, and Greg participated in the kidnapping and assault. Thus, we will affirm the District Court's sentence.

## Conclusion

For the foregoing reasons, we will affirm the convictions and the District Court's sentencing orders of Thomas Hopes, Keith Harris, and Greg Harris.

United States of America v. Keith **Harris**
United States of America v. Gregory Harris, Jr.
United States of America v. Thomas Hopes
Nos. 16-1448/537/644

_____

AMBRO, <u>Circuit Judge</u>, dissenting

The District Court appeared to allow law enforcement officers at appellants' trial to give expansive "lay opinion" testimony in violation of Federal Rule of Evidence 701 ("FRE 701")[1] and the Sixth Amendment right of confrontation under *Crawford v. Washington*, 541 U.S. 36, 59 (2004). That testimony prejudiced these appellants, and I believe the majority misapplies FRE 701 and *Crawford* to reach a contrary result. I thus respectfully dissent on the following three grounds.

**1. Lay Opinion Regarding the "Uptown Crew"**

In the first few minutes of trial, the very first witness, Agent Francis, declared the existence of an organization called the "Uptown Crew," which he described as a "group of individuals based . . . primarily in Homestead and Munhall" who "generated income . . . by trafficking heroin and other narcotics at times." (JA 115.) He testified that members of this supposed conspiracy "would primarily associate with each other by making a fist with the index finger and the little finger pointed up in the shape of a U for

_____

[1] To repeat what is explained in the majority opinion, this Rule states that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

1

Uptown. They would also wear University of Miami clothing primarily with the large U symbol on it." (JA 115–16.)

Francis gave this expansive testimony in response to the tenth question at trial. (*See* JA 113–15.) The prior nine questions related to his background in law enforcement and assignment to the investigation that led to the prosecution in this case. (*Id.*) In other words, before a single fact about any of the building blocks needed to convict—the charged conspiracy, the defendants, their alleged co-conspirators, the drug-trafficking, or their conduct—had been presented to the jury, the Government's principal case agent, an experienced FBI official, was "opining" to the jury on the essential facts of the very criminal conspiracy the Government must prove to convict the defendants. Defense counsel objected to this testimony, stating that Francis "hasn't made a foundation as to how he came to know this conclusion and what his conclusions were based on." (JA 116.) But the District Court overruled that objection. (*Id.*)

During the ensuing examination, Agent Francis stated that his testimony on the Uptown Crew was based generally on his extensive investigation leading to the prosecution in this case. He described in general terms the techniques he and the investigative team used to gather information about Uptown. He said they used surveillance, witness interviews, wiretaps, and controlled deliveries to determine that members of Uptown were selling heroin in Pittsburgh. (JA 117–24.) He also testified that he spent "hundreds" of "man-hours" and reviewed "tens of thousands" of wiretapped phone calls in the course of investigating this case. (JA 118–19.) But he made all these statements as general conclusions—he did not identify the specific observations,

2

statements, or events that underpinned his determination that an organization called the Uptown Crew existed, trafficked heroin, or used the "U" symbol or University of Miami clothing to identify themselves.[2]

Further, based on his overall investigation, Agent Francis testified on the membership of Uptown. Without specifying the facts underlying his testimony, he opined that Sterling Marshal—one of appellants' alleged co-conspirators—was "an associate of the Uptown Crew," that Anthony Smith was "also a part of the Uptown organization," and that "Hakeem Kirby was an associate of the Uptown Crew who delivered heroin to customers for [appellant] Thomas Hopes." (JA 209–10, 214, 225.)

Rather than exclude this "lay opinion" testimony, the District Court gave a special instruction that elevated its legitimacy and reliability in the eyes of the jury. Specifically, at the end of Agent Francis' testimony on the first day of trial, the Court instructed the jury as follows:

> Witnesses are not generally permitted to state their personal opinions about important questions in a trial. However, a witness may be allowed to testify as to his or her opinion if it's rationally based on the witness's perception and it's helpful to a clear understanding of the witness's testimony or to the determination of a fact at issue. In this case I am permitting Agent Francis to offer his opinion **based on his perceptions based on his investigation**.

(JA 257 (emphasis added).) In other words, the District Court ruled, and instructed the jury, that Francis could opine under FRE 701 about the existence, structure, emblems,

---

[2] He also did not explain how he concluded that references to "Uptown," the "U" symbol, or University of Miami clothing had a conspiratorial drug-trafficking significance rather than being a benign reference to the neighborhood in Pittsburgh, called Uptown, where appellants lived. (JA 791.)

objectives, and membership of the supposed Uptown Crew based generally on his investigation of appellants, without presenting to the jury the specific perceptions made in that investigation, so long as Francis was personally involved in it.

The District Court extended the same reasoning to testimony given by Detective Caterino, another key prosecution witness. As the supposed foundation for his testimony, Caterino stated that he invested at least 1500 "man-hours" into "this investigation" (JA 754), during which he had "seen evidence of an organization known as Uptown" (JA 767). He explained he'd seen "[y]oung black males wearing the Miami University hoodie or hat, the U . . . [in] the [neighborhood], and I also observed it on YouTube videos." (JA 767–68.) Caterino then identified defendants and others wearing University of Miami clothing and making what he called "the Uptown" sign in photographs and a rap video. (JA 772–83.) He never explained the specific observations, statements, or other perceptible facts from which he determined the existence of a cohesive "Uptown" organization (as opposed to young black individuals living in the same neighborhood and wearing clothing that references it), nor the link between that supposed organization and the "U" sign or University of Miami clothing, nor the link between any of this and the trafficking of heroin.

My colleagues concede that Agent Francis' initial Uptown testimony was not admissible due to lacking a proper foundation (Majority Op. at 24), but they conclude that admitting the testimony was "harmless" because, later in the trial, Francis described "his personal involvement" in the investigation of the case (*id.*). As for the testimony of Detective Caterino, the majority states that he "laid the foundation" for his opinions by

4

testifying that he "worked in Homestead for years," and that he knew defendants Keith Harris and Gregory Harris, knew their father, and knew the other two defendants "from working the area." (*Id.* at 24-25.) My colleagues note also that Caterino drew on his targeted investigation in this case, in which he "conducted surveillance, listened to wiretaps, made arrests, [and executed] search warrants." (*Id.* at 25) In other words, the majority concludes that a law enforcement witness may opine on the essential elements of a crime charged—such as the existence and objectives of a conspiracy—based on information and documents obtained in the investigation, but never presented to the jury, so long as the officer claims to have performed the investigation "personally."

In my view, this application of FRE 701 is incorrect. Contrary to the majority's conclusion, a law enforcement witness's general description of his "personal involvement" in a criminal investigation is not an adequate foundation to opine on elements of the charged crime. To be sure, federal courts generally allow law enforcement witnesses to draw on their personal perceptions in an investigation to interpret for the jury code language used by defendants and their alleged co-conspirators in written messages and wiretapped conversations. *See United States v. Gadson*, 763 F.3d 1189, 1212–13 (9th Cir. 2014); *United States v. Albertelli*, 687 F.3d 439, 447 (1st Cir. 2012). But the limited permission afforded by these decisions—that is, the permission to draw on investigative experience to interpret code language—is narrow. It does not extend to the kind of testimony Agent Francis and Detective Caterino gave concerning the supposed Uptown conspiracy. Tellingly, neither the Government nor the majority points to a case in which a law enforcement officer was permitted to give "lay

5

opinion" testimony under FRE 701 on the existence, objectives, and membership of an alleged conspiracy based generally on his overall "investigation" of the very defendants on trial. The majority cites only to *Gadson* for that proposition, yet it goes on to concede that case involved only the interpretation of code language—not the kind of broad conclusion testimony as to essential elements of the crime, which is what we review here. (Majority Op. at 25–26.)

Moreover, I disagree with the majority's conclusion that Francis' initial testimony was "harmless" because the Government eventually presented evidence to substantiate it. (*Id.* at 24–25.) Even if the Government had subsequently laid a proper foundation for that testimony—which it did not, as noted above—it would nonetheless be a clear and prejudicial error to allow it to open its case by having Francis declare that his investigation had confirmed that defendants were guilty of the crimes charged. That kind of opening testimony creates the grave risk of unfairly skewing the jury's perception of the evidence later admitted. For that reason, federal courts have roundly rejected the Government's attempt in prosecutions across the country to "open its case with an overview witness who summarizes evidence that has not yet been presented to the jury." *Garcia*, 413 F.3d at 214 (quoting 6 Weinstein's Federal Evidence § 1006.40[3])) (collecting cases); *see also United States v. Moore*, 651 F.3d 30, 56–57 (D.C. Cir. 2011).

There is a good reason courts do not allow law enforcement to "opine" on the essential elements of a charged criminal conspiracy: it undermines the jury's role as the factfinder in violation of FRE 701(b). Judge Raggi's opinion for the Second Circuit in *United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005), explains why this kind of opinion

6

testimony is inadmissible. When law enforcement witnesses take the stand to give testimony "based on the total investigation of the charged crimes," they are giving *summary* opinions. Rather than telling the jury about specific "words and actions witnessed," a summary opinion, based on the entirety of a criminal investigation, tells the jury that "unspecified information, which may or may not be received in evidence [later in the trial], establishes a defendant's guilt." *Id.* at 214. The problem with this kind of testimony is obvious: "[I]f such broadly based opinion testimony as to culpability were admissible under Rule 701, there would be no need for the trial jury to review personally any evidence at all." *Id.* at 214 (quotation omitted). This is "precisely what the second foundation requirement of Rule 701 is meant to protect against." *Id.* at 215.

*Garcia* is broadly in line with our decisions applying FRE 701(b), in which we have held consistently that lay opinion testimony must not usurp the jury's role as the finder of fact. *See, e.g.*, *United States v. Dicker*, 853 F.2d 1103, 1109 (3d Cir. 1988); *United States v. Fulton*, 837 F.3d 281, 291 (3d Cir. 2016); *United States v. Jackson*, 849 F.3d 540, 553–54 (3d Cir. 2017).

The majority distinguishes *Garcia*, concluding that, unlike in that case, here the law enforcement witnesses laid a foundation "through [their] extensive personal involvement in a case." (Majority Op. at 28.) But the majority cannot muster a single case for that proposition. Presumably this is because federal courts allow a case agent's general personal investigation to lay the foundation for interpreting code language, *see, e.g.*, *Gadson*, 763 F.3d at 1212–13, but they do not—and should not—allow that "personal investigation" broadly to lay a foundation for conclusions on the essential

elements of the crimes charged, *see, e.g.*, *Garcia*, 413 F.3d at 214–15.  As Judge Raggi explained in *Garcia*, when law enforcement officials gather evidence of a crime through their investigation, they may come to trial and present the admissible evidence they gathered.  *Id.*  But they may not give summary opinions on the conclusions they reached based on the investigation, especially as to essential elements of the crime.  *See id.*  That is what Agent Francis and Detective Caterino did in this case with respect to the existence, structure, emblems, objectives, and membership of the supposed Uptown Crew.

Seeking to shore up the record, the majority contends that Caterino validly drew a connection between the "U" sign, University of Miami clothing, and selling heroin based on "several days of surveillance and explaining how he discovered the youtube videos" that included "hand signs, hoodies, and references to 'uptown.'"  (Majority Op. at 26 n.10.)  But as with the rest of Caterino's testimony, none of these general statements ever connected the dots between the "U" signs and the illegal trafficking of heroin.  Indeed, at trial Caterino gave specific testimony about only two hand-to-hand heroin transactions— one by an "unknown black male" (JA 758), and one by William McDonald (JA 761).  Yet neither of those men was identified in the rap video or photographs involving the "U" sign or University of Miami clothing.  (*See* JA 772–84 (naming eighteen men in the video and photographs, none of whom was the "unknown black male" or McDonald).)[3]

---

[3] In a footnote, the majority suggests that Francis' and Caterino's testimony was permissible in part because defense counsel could have "cross examine[d] the agents regarding the lack of their personal knowledge."  (Majority Op. at 28 n.11.)  That puts the burden on the wrong side.  The Rule requires a witness to establish a proper foundation

8

Moreover, the majority's effort to find record support for recognizing a cohesive organization called the "Uptown Crew" is curious given the briefing before us; in its opposition the Government conceded that its own case agents manufactured the label "Uptown Crew." (*See* Govt. Opp'n to Hopes Br. at 76 n.29; *see also infra*.) You read that right. On appeal the Government conceded that its own case agents, including Agent Francis and Detective Caterino, "[a]ffix[ed] the name 'Uptown'" to defendants and their alleged associates because it was "helpful conceptually." (*Id.*) In other words, aside from being a useful framing device created by law enforcement, there may be no such thing as the "Uptown Crew." The Government's own case agents created that label as a helpful concept for themselves—as well as the jury—and "affixed it" to the group of individuals they had decided to charge with a conspiracy.

Appellants properly objected to the admission of this testimony at trial (JA 115–16, 754, 767–68, 771), and they squarely presented this argument in their appellate briefs (Greg Br. at 36, 56; Hopes Br. at 53–61; Keith Br. at 29–30). Admitting the conclusory Uptown testimony, I believe, was not harmless. An erroneous evidentiary ruling is harmless error "when it is highly probable that the error did not affect the result." *United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011) (quotation omitted). To reach the quantities of heroin for which defendants were convicted, the Government expanded the scope of the alleged conspiracy to include the many individuals it described as the "Uptown Crew." Not only did the Government invent the "Uptown Crew" label as a

_____

for lay opinion before giving it; that foundation was lacking, *see supra*, and defendants were not obliged to use their cross-examination to cure the Government's error.

9

"helpful concept," *see supra*, it leaned hard on that concept to obtain defendants' convictions.

The glue holding together its broad theory of conspiracy in this case was the idea of the Uptown Crew that it emphasized in opening arguments, reinforced through law-enforcement testimony, and hammered again in closing. (*E.g.*, JA 80, 116–24, 754, 767, 1595.) In that closing, the Government expressly told the jury that the legally relevant conspiracy in the case was "Uptown," and the main question for the jury was "did these four [defendants] actually sign onto it [*i.e.*, Uptown] and take part." (JA 1595.) Given the central role the concept of the "Uptown Crew" played in the presentation of the case and the manner in which the Government defined and proved the charged conspiracy, I cannot conclude it is "highly probable that the error" of admitting the Uptown opinion testimony "did not affect the result." *Friedman*, 658 F.3d at 352. Without the overarching "Uptown" conspiracy to hold together the numerous alleged co-conspirators, the jury may not have reached the same convictions (Hopes for 1 kilogram, Keith Harris for 1 kilogram, Greg Harris for 100 grams).

## 2. Lay Opinion Identifying Keith Harris as "Doe"

The majority acknowledges that Agent Francis and Task Force Officer Countryman both testified that their investigations involved, among other things, conducting witness interviews and speaking with informants. (Majority Opinion at 16.) It also acknowledges that trial testimony based on testimonial hearsay can violate a defendant's Sixth Amendment right of confrontation (*id.* at 15), a right recognized by *Crawford v. Washington*, 541 U.S. at 59. Still it concludes that Agent Francis' and

10

Officer Countryman's identification of Keith Harris as "Doe" was admissible and not in violation of his confrontation right.

According to the majority, there was no violation because of "the extensive non-testimonial evidence that the government admitted that ties [Keith Harris] to his phone number and the nicknames." (Majority Op. at 17.) But the sole non-testimonial evidence linking Keith to the nickname "Doe" is a single phone call on which someone referred to Greg Harris as "Doe's Brother," a term that need not mean blood siblings without further context. (*Id.* at 17–18) The other evidence cited by the majority assumes without explanation that Keith Harris used a phone number ending in "8745." (*Id.* at 17) But how did the Government link that phone number to Keith? The majority contends, based on its own inferences from the record, that "Francis and Countryman relied on non-testimonial evidence based on their involvement in the wiretaps and surveillance to conclude that Keith is 'Doe.'" (*Id.* at 18.) Agent Francis told us otherwise at trial: he said the Government "identified his phone number through previous calls during the wiretap *and through informants and local law enforcement*." (JA 247 (emphasis added).) In other words, Francis says he identified Keith Harris as the perpetrator of the alleged crimes based on hearsay statements by informants and hearsay statements by other law enforcement. That is a classic violation of the Sixth Amendment right of confrontation. *See United States v. Hinton*, 423 F.3d 355, 360 (3d Cir. 2005); *United States v. Moreno*, 809 F.3d 766, 774 (3d Cir. 2016).

Further, it was not harmless to allow this identification. The violation of Keith Harris's right of confrontation is a constitutional error, so "we must consider whether the

11

error was harmless beyond a reasonable doubt." *United States v. Lore*, 430 F.3d 190, 209 (3d Cir. 2005). We cannot plausibly reach that conclusion. At trial, the Government struggled noticeably to draw the link between Keith Harris and Doe. The name Keith was not linked to "Doe" on any of the wiretapped phone calls played for the jury. No informant testified at trial that he or she communicated with Keith using the phone number attributed to him through the nickname Doe. No witness other than law enforcement testified or suggested that any of the calls played at trial actually involved the communications of Keith. No evidence was presented linking the phone number associated with "Doe" to Keith.

In the absence of a link between Keith and "Doe," the Government fell back to its evidentiary panacea: "lay opinion" by law enforcement officials based on their entire investigation. This began with Agent Francis. In a contortion of the English language, the Government asked him to give his "interpretation" of what the word "Doe" meant when used on an audiotape. (JA 242.) Francis said his "interpretation" was that "Doe" is Keith Harris. (JA 243.) He made that so-called interpretation based on his overall investigation. (*See id.*) Similarly, Countryman testified that "Doe *I know from this investigation* is a shortened version of Keith's street name, which is Keydo." (JA 369 (emphasis added).) The problem here is glaring: the identification of Keith as "Doe" was not a semantic decoding of specialized language, as may be permitted under FRE 701, *see Jackson*, 849 F.3d at 553–54. It was the substantive identification of the defendant as the perpetrator of the charged crime based on unspecified evidence never presented to the jury.

12

The weakness in the Government's proof on this point came into sharp relief when it examined Arlene Hernandez (a.k.a. "Pooky"). She was Greg Harris's girlfriend and the mother of his child. She testified under a grant of immunity. The Government asked her whether she knew any nicknames of Keith. When she said no, the Government persisted, asking "Are you sure about that?", to which she responded "[p]ositive." (JA 1235.) You can almost hear the Government's swing and miss from the transcript. Putting this in context, a civilian witness who has close personal relations with the brother and an alleged co-conspirator of Keith Harris stated flatly that she does not know any nickname for him. The only testimony presented to the jury linking Keith to "Doe" was the *ipse dixit* of Agent Francis and Officer Countryman based on unspecified evidence they claimed to have gathered in the course of their overall investigation—including information from "informants and local law enforcement." (JA 247.)

On appeal, the Government attempted to cure this identification problem by cobbling together record evidence that arguably links Keith to the nickname "Doe." (Govt. Opp'n at 25–32.) But this new synthesis—which, like the majority's analysis, hangs thinly on a phone call referring to Doe as Greg's "Brother"—was not presented to the jury. It strains belief to claim we can predict how the jury would have assessed the evidence against Keith if the Government were required to prove that he was "Doe" through competent evidence rather than presenting all of its evidence—mostly audiotapes—from the starting premise that Keith is the person who is discussed and participating in them.

13

In arguing the "Doe" identification was harmless, the Government basically asks us to consider a web of evidence the jury was never asked to evaluate. (Govt. Opp'n to Keith Harris at 25–28.) On this record, I cannot conclude the violation of Keith Harris's Sixth Amendment right of confrontation was "harmless beyond a reasonable doubt." For this reason, I would vacate the conviction against Keith Harris.

### 3. Officer Countryman's Other Lay Opinion

The majority concludes that "[a]t several points" the District Court permitted Officer Countryman to explain non-coded terms used on audiotapes in violation of FRE 701. (Majority Op. at 19.) He drew on his overall investigation to interpret non-coded words and give narrative elaboration on phone calls based on facts he purportedly knew from his overall investigation but which were neither presented to the jury nor discernible from the calls themselves. The majority rightly concludes this testimony went beyond what is permitted by FRE 701. (*Id.* at 19–20.) Nonetheless it concludes the District Court did not commit clear error by admitting the testimony. (*Id.*) It reasons that, at the time of trial, the Court did not have the benefit of our opinion in *United States v. Fulton*, 837 F.3d 281, 291 (3d Cir. 2016), in which "we concluded that an agent's interpretation of non-coded phone records violated [FRE] 701." (Majority Op. at 20.) The majority concludes that, "[a]bsent *Fulton*, the errors here . . . would not have been plainly or obviously improper to the trial court." (*Id.* at 21.)

I respectfully disagree with this account of our precedent under FRE 701. For decades—and long before *Fulton*—we have consistently held that this Rule does not

14

permit law enforcement witnesses to interpret or elaborate narratively on non-coded language in audiotapes or other forms. In *United States v. Dicker*, for example, we stated:

> Although courts have construed the helpfulness requirement of [FRE] 701 and 702 to allow the interpretation by a witness of coded or "code-like" conversations, they have held that the interpretation of clear conversations is not helpful to the jury, and thus is not admissible under either rule.

853 F.2d 1103, 1109 (3d Cir. 1988); *accord United States v. Hoffecker*, 530 F.3d 137, 170–71 (3d Cir. 2008). Indeed, the *Fulton* panel itself acknowledged this prohibition is well established, stating "[w]e have consistently excluded testimony" that purports to interpret non-coded language. 837 F.3d at 292–93 (citing *Dicker* and *United States v. Anderskow*, 88 F.3d 245, 250–51 (3d Cir. 1996)). In short, the bar on testimony of this kind is well established in our case law. It was clear error to admit it.[4]

*   *   *   *   *

Federal Rule of Evidence 701 permits the admission of lay opinion testimony that has a proper factual basis and is helpful to the jury. It does not give law enforcement witnesses free rein to tell the jury the conclusions of their investigations of a criminal defendant, however diligent and rigorous those investigations may be. Government witnesses must present the state's evidence in a public trial before a jury; they cannot examine the state's evidence in their investigation rooms and then tell the jury conclusions that only the jury should reach. This is a line we must hold firmly, as it may protect against prosecutorial overreach in future cases. Thus I respectfully dissent.

---

[4] I would not, however, vacate the convictions on this particular ground because Officer Countryman's improper testimony about the stamp bags, heroin packaging, and the stash house was not sufficiently prejudicial to establish plain error.